[No. A035109. First Dist., Div. Four. Sept. 15, 1987.]

THE PEOPLE, Plaintiff and Appellant v.
FLOYD LEE, Defendant and Respondent.

COUNSEL

John K. Van De Kamp, Attorney General, and Ronald E. Niver, Deputy Attorney General, for Plaintiff and Appellant.

James R. Jenner, Public Defender, and J. Clifton Taylor, Jr., Assistant Public Defender, for Defendant and Respondent.

OPINION

POCHÉ, J.—Defendant was charged with possession of heroin for sale. At the preliminary hearing he moved to suppress heroin-filled balloons which had been seized from his person. The magistrate found that the balloons had been properly seized following a detention and pat-search under *Terry v. Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868]. However, the superior court granted defendant's motion under Penal Code section 995 to set aside the information on the ground that the evidence should have been suppressed. We hold that the magistrate's ruling is sustainable, and that the superior court erred in setting aside the information.

## 1. *Facts.*

The evidence adduced at the preliminary hearing established that on February 1, 1986, Officers Dunbar and Robertson were on foot near the intersection of Seventh and Pine Streets in Oakland, asking citizens about possible drug sales in that area. A woman told them that within the preceding five minutes she had been walking past a park on the west side of Wood Street between Eighth and Goss when a man offered to sell her heroin. The area she described was known to Dunbar for "high narcotic activity." The woman said that the man offering the heroin was standing together with another man. It appears that the woman also reported seeing a third man, who turned out to match defendant's description, standing at the northeast corner of Eighth and Wood.[1]

---

[1] The meaning of Officer Dunbar's testimony on this point is disputed. The transcript reads as follows:

"Ms SPRAGUE: Q Did the person that you were talking to, that citizen informant, did that person tell you there was anybody in that area at that park area?

"A Yes. I noticed a male black, wearing a black cap and blue clothing.

"THE COURT: Now, is this what you noticed or what the citizen told you?

"THE WITNESS: What the citizen told me standing on the northeast corner of 8th Street and Wood, as they had been walking southbound on Wood Street when they were contacted by the taller, two male blacks.

Armed with this information, the officers drove in separate patrol cars to the area described, where they saw three men—two standing together on the west side of Wood, and another (defendant) standing at the northeast corner of Eighth and Wood. As the officers approached, one of the two men standing together called out "rollers, rollers," an expression Officer Dunbar recognized from prior experience as a warning that the police were approaching. There was no one else in the vicinity except defendant.

Immediately after the warning was called, defendant turned and began to walk westbound across Wood Street. Officer Dunbar drove his car to within 15 to 20 feet of him. At that point, before the officer had given any signal or command, defendant turned toward the car and reached inside his jacket. The officer's training and experience indicated that persons involved in the sale of narcotics often arm themselves as protection against would-be pirates. Therefore, Officer Dunbar believed defendant was reaching for a weapon and told him to remove his hand from his jacket, which he did. He then pat-searched the chest area of defendant's jacket. He felt a clump of small resilient objects. He knew the clump was not a weapon but he believed he had touched heroin-filled balloons. He then arrested defendant for possession of heroin, reached inside defendant's jacket, and removed two transparent bags, each containing 50 rolled toy balloons. He then arrested defendant for possessing heroin for sale. It was stipulated for purposes of the preliminary hearing that the balloons in fact contained heroin.

## 2. *Standard of Review.*

■ We are first confronted with an issue of the standard of review to be applied. Since the magistrate denied the motion to suppress and held defendant to answer, the governing principles would appear to be those stated in *People* v. *Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278]: ■ "[I]n proceedings under section 995 it is the magistrate who is the finder of fact; the superior court has none of the foregoing powers [i.e., to weigh evidence, resolve conflicts, and draw its own inferences], and sits merely as a reviewing court; it must draw every legitimate

---

"MS SPRAGUE: Q Just so I get this straight, there was another male black located near the park but separated from those two other male blacks; is that correct?
"A Yes, ma'am."
Despite defendant's contrary assertion, we believe the only reasonable interpretation of this testimony is that the informant told the officers a third man, i.e., defendant, was nearby when the heroin was offered. The testimony must have been unambiguous as *heard,* since the court was apparently satisfied with its efforts to clarify the matter. Moreover, any ambiguity largely disappears if one inserts a period after the first clause in the witness's answer to the court, and assumes that the remainder of the answer was a continuation of the preceding answer. Thus the apparent sense of the answer is, "[This was] [w]hat the citizen told me[.] [The man wearing the black cap was] standing on the northeast corner of 8th Street and Wood."

inference in favor of the information, and cannot substitute its judgment as to the credibility or weight of the evidence for that of the magistrate. (*People* v. *Hall* (1971) 3 Cal.3d 992, 996 [92 Cal.Rptr. 304, 479 P.2d 664], and cases cited.) ▮ On review by appeal or writ, moreover, the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate holding the defendant to answer. (*People* v. *Maltz* (1971) 14 Cal.App.3d 381, 389 [92 Cal. Rptr. 216]; see generally *People* v. *Sanchez* (1972) 24 Cal.App.3d 664, 690, fn. 15 [101 Cal.Rptr. 193].)"

▮▮ Citing *People* v. *Slaughter* (1984) 35 Cal.3d 629 [200 Cal.Rptr. 448, 677 P.2d 854], defendant contends that we should review the record "independently" because the magistrate made no express findings. This contention rests on a misconstruction of *Slaughter,* which involves the standard of review to be applied when the magistrate has found the evidence insufficient to bind the defendant to answer under Penal Code section 872. The court noted that the magistrate has a "limited role" in that situation and "is not a trier of fact." (35 Cal.3d at p. 637.) Indeed the magistrate's task may be performed without exercising any factfinding functions whatsoever. (*Id.* at p. 638.) Therefore, unless the magistrate actually makes findings, the reviewing court cannot assume that any factual issues have been resolved and, for this reason, cannot indulge factual inferences in favor of the ruling. (*People* v. *Slaughter, supra,* 35 Cal.3d at p. 638.) This reasoning does not mean that all factual determinations by a magistrate are independently reviewed if not embodied in express findings.

Defendant also cites *People* v. *Aldridge* (1984) 35 Cal.3d 473, 477 [198 Cal.Rptr. 538, 674 P.2d 240], apparently implying that we should exercise our independent judgment as to the facts because they are "undisputed." However, the present case is not properly characterized as one of "undisputed facts," even though the testimony of officers Dunbar and Robertson (which comprises the entire record of the preliminary hearing) is uncontradicted. The evidence supports conflicting inferences as to "what the officer actually perceived, or knew, or believed, and what action he took in response." (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596 [174 Cal.Rptr. 867, 629 P.2d 961].) One such issue is what, if anything, the citizen informant said about defendant's presence at the scene of the attempted heroin sale. (See fn. 1, *ante.*) Another is the timing of Dunbar's tactile recognition of the heroin balloons: defendant contends that this came after Dunbar discovered that defendant was not armed; the People describe the events as more or less simultaneous. To the extent the magistrate chose from among conflicting inferences on these points, he decided "traditional questions of fact" (*People* v. *Leyba, supra,* 29 Cal.3d at p. 596), and we indulge all reasonable inferences in favor of his order.

### 3. *Initial Stop.*

We next consider whether there was sufficient justification for Officer Dunbar's initial detention of defendant. The governing principles were stated in *In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957]: "[I]n order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience . . . , to suspect the same criminal activity and the same involvement by the person in question. The corollary to this rule, of course, is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. (*Terry* v. *Ohio, supra,* 392 U.S. at p. 22 [20 L.Ed.2d at pp. 906-907].)" (Fn. omitted.)

Officer Dunbar could reasonably believe that criminal activity was occurring here, based on the citizen informant's statement that she had just been offered heroin. Such a tip may be relied upon even if the citizen informant's reliability has not been tested. (*People* v. *Duren* (1973) 9 Cal.3d 218, 240 [107 Cal.Rptr. 157, 507 P.2d 1365].)

Several additional facts known to Officer Dunbar supported a more particular suspicion directed at defendant: (1) For at least five minutes, he had been standing in the vicinity of persons reported to be selling drugs; (2) one of the sellers called a warning, which was apparently addressed to defendant since there was no one else in the vicinity; (3) in apparent response to the warning defendant began to leave the area; and (4) upon the officer's approach defendant turned toward him and reached into his jacket, where based on his experience the officer could reasonably expect a narcotics vendor to be keeping a weapon.

No detention had yet occurred when defendant reached into his jacket. Officer Dunbar had done nothing other than drive to a point near defendant. Apparently he had not even gotten out of his patrol car. He had not accosted defendant. (Compare *People* v. *Bower* (1979) 24 Cal.3d 638, 643 [156 Cal.Rptr. 856, 597 P.2d 115].) There is no evidence that he was or appeared to be *chasing* defendant. (Compare *People* v. *Washington* (1987) 192 Cal.App.3d 1120 [236 Cal.Rptr. 840].) Nor does the record disclose any other display of authority which would have made a reasonable person .

believe he or she was not free to leave. (Compare *People* v. *Bailey* (1985) 176 Cal.App.3d 402, 407 [222 Cal.Rptr. 235] [pulling up behind defendant's car and flashing emergency lights].) "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place." (*Florida* v. *Royer* (1983) 460 U.S. 491, 497 [75 L.Ed.2d 229, 103 S.Ct. 1319].)

 When defendant turned toward the patrol car and placed his hand inside his jacket, Officer Dunbar believed that he was reaching for a weapon. This belief was objectively reasonable in light of the factors suggesting that defendant was engaged in selling narcotics, coupled with the officer's knowledge that persons engaged in selling narcotics frequently carry firearms to protect themselves from would-be robbers. The ensuing detention and pat-search were in fact motivated by a desire to check for weapons. During Officer Dunbar's approach and search, Officer Robertson was occupied with the other two suspects. We cannot fault the magistrate's conclusion that the detention and search were justified.

### 4. *Scope of Search.*

 Defendant next contends that Officer Dunbar's pat-search exceeded the scope permitted under *Terry* v. *Ohio, supra,* 392 U.S. 1. This argument appears to devolve into three propositions: (1) Because Officer Dunbar knew the object he detected was not a weapon, he was ipso facto precluded from seizing it; (2) the method of probing defendant's clothing was unduly intrusive; and (3) Officer Dunbar impermissibly continued to probe after he had ruled out the possibility that defendant was armed.

We reject the notion that an officer who reliably detects contraband during a properly conducted *Terry* search cannot seize it. In the cases cited by defendant, objects were seized without any articulable basis for believing they were contraband. (*People* v. *Leib* (1976) 16 Cal.3d 869, 872 [129 Cal.Rptr. 433, 548 P.2d 1105] [pill bottle]; *Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150, 154 [98 Cal.Rptr. 649, 491 P.2d 1] ["unidentified lump"; "idea or hunch" that it was pills]; *People* v. *Collins* (1970) 1 Cal.3d 658, 662 [83 Cal.Rptr. 179, 463 P.2d 403] ["little lump"]; see *State* v. *Collins* (Ariz. App. 1983) 139 Ariz. 434, [679 P.2d 80, 82] ["bulky items"].) The thrust of these cases is exemplified by *People* v. *Collins, supra,* in which the court condemned seizures based on "fanciful speculations" such as that a soft object might be a rubber water pistol loaded with caustic fluid. (1 Cal.3d at

p. 663, disapproving *People* v. *Armenta* (1968) 268 Cal.App.2d 248 [73 Cal.Rptr. 819].)

Here Officer Dunbar was not engaging in fanciful speculation when he arrested defendant and seized the heroin. He first formed a definite belief based on articulable facts and on considerable training and experience in the tactile characteristics of narcotics-filled balloons. He recognized the feel of such balloons from at least 100 other occasions on which he had pat-searched people and felt what were later determined to be heroin-filled balloons. As he described it, the feel is unmistakable: each balloon has about the size and shape of a pea, with a "textured rubber feeling" and a "bounce or bend that bounces back to its original shape." While individual balloons feel soft, they are harder and less resilient when put together in a package.

▮▮▮ Knowledge gained by a police officer through the sense of touch is as meaningful as knowledge gained through other senses. (*People* v. *Chavers* (1983) 33 Cal.3d 462, 471 [189 Cal.Rptr. 169, 658 P.2d 96].) " 'Reasonable grounds for believing a package contains contraband may be adequately afforded by its shape, its design, and the manner in which it is carried.' " (*People* v. *McKinnon* (1972) 7 Cal.3d 899, 917 [103 Cal.Rptr. 897, 500 P.2d 1097], quoting *People* v. *Anderson* (1968) 266 Cal.App.2d 125, 132-133 [71 Cal.Rptr. 827]; see *People* v. *Lilienthal* (1978) 22 Cal.3d 891, 898-899 [150 Cal.Rptr. 910, 587 P.2d 706] [paper "bindles" typically used to transport cocaine or heroin]; *Texas* v. *Brown* (1983) 460 U.S. 730, 742-743 [75 L.Ed.2d 502, 103 S.Ct. 1535] [heroin balloons].) The present situation presents the tactile equivalent of cases where an officer permissibly and reliably detects contraband through sight or smell and thereupon arrests the defendant. (E.g., *Texas* v. *Brown, supra,* [heroin balloons, other paraphenalia in plain view]; *People* v. *Gale* (1973) 9 Cal.3d 788, 793-794, fn. 4 [108 Cal.Rptr. 852, 511 P.2d 1204] [smell of fresh marijuana]; *People* v. *Stanfill* (1985) 170 Cal.App.3d 420 [216 Cal.Rptr. 472] [detailed visual observations of marijuana sale]; *People* v. *Guy* (1980) 107 Cal.App.3d 593 [165 Cal.Rptr. 463] ["baggie" containing phencyclidine].) ▮▮▮ Thus Officer Dunbar's tactile perceptions, coupled with the other facts known to him, furnished probable cause to believe that defendant's jacket contained heroin, and therefore to immediately arrest him. At that point the officer was entitled to conduct a more thorough search as an incident of which the contraband could be seized. (See *People* v. *Sanchez* (1985) 174 Cal.App.3d 343, 347 [220 Cal.Rptr. 53].)

▮▮▮ Nor can we conclude that the manner of searching was unreasonably intrusive. Perhaps the most concise definition of a pat-search is "a

careful exploration of the outer surfaces of [a defendant's] clothing." (*Terry v. Ohio, supra,* 392 U.S. at p. 16 [20 L.Ed.2d 889].) Officer Dunbar pressed the outside of defendant's clothing with the palm of his right hand and then used "a kind of grabbing or claw-type of motion to ascertain the object." He did not reach inside defendant's clothing until after he identified the object as contraband and arrested defendant. Therefore defendant's argument boils down to the idea that a gripping or "claw-type" motion exceeds the scope of a *Terry* pat-down. Recognizing that the purpose of the pat-down is to dispel the suspicion that a person is armed, it seems to us that something more is contemplated than a gingerly patting of the clothing. In *People v. Collins, supra,* 1 Cal.3d 658, 663, the court recognized that in order to rule out the presence of a weapon the officer may have to determine an object's "weight and consistency." (See *id.,* at p. 664.) We fail to see how this can be accomplished without using some sort of gripping motion.

■ This leaves only the question whether Officer Dunbar improperly continued to "frisk" defendant after determining that he was not in fact armed. Defendant asserts that Officer Dunbar first determined the object was not a weapon and then proceeded to "pinch," "squeeze," and "probe" until he identified it as contraband. The evidence is sufficient, however, to support a different view—namely, that the entire search, including the gripping motion, was necessary to rule out the presence of a weapon, and that there was no appreciable lapse of time between Dunbar's realization that the object was not a weapon, and his realization that it was a bundle of heroin-filled balloons. Assuming that this is what the magistrate found, as we must, we cannot say that the detection of the contraband resulted from any impropriety.

Defendant cites *State v. Hobart* (1980) 94 Wn.2d 437 [617 P.2d 429], which overturned a seizure of narcotic-filled balloons in the course of a *Terry* search. The court apparently concluded that the officer ruled out a weapon and then probed further "with the obvious purpose of ascertaining whether [the objects] had the shape and consistency of balloons . . . ." (617 P.2d at pp. 433-434.) Similarly, the officer in *State v. Broadnax* (1982) 98 Wn.2d 289 [654 P.2d 96], conducted a thorough search in the mistaken belief that the defendant had been arrested. He felt a "small bulge" which "didn't feel like a gun or weapon," moved to other parts of the defendant's person, and then returned to the bulge. (654 P.2d at p. 103, fn. 2.) Neither case involved what occurred here, namely, a definite identification of the object as contraband simultaneously with the elimination of the possibility of a weapon. Nothing in the present case would permit us to find that the search was aimed at something other than weapons.

The order of dismissal is reversed.

Anderson, P. J., and Channell, J., concurred.