[No. B196202. Second Dist., Div. Six. Nov. 7, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD EDWARD WILLIAMS, Defendant and Appellant.

## COUNSEL

Ilan Funke-Bilu for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Robert F. Katz and Robert M. Snider, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

YEGAN, J.—Lawyers appreciate a trial court which candidly explains the reasons for its rulings. This may help lawyers and their clients in assessing the strengths and weaknesses of their cases. This is in contrast to the trial court which utters words like "granted," "overruled," "denied," "sustained" without any explanation as to how it reached its pretrial or trial rulings. A trial court which elects to explain its rulings should consider how its explanations will appear. Here, the trial court was deeply troubled by its perception of perjury. Its outpouring of candor resulted in another judge disqualifying it for cause on a charge of bias even though the trial court denied that it was biased. A trial court which is contemplating a comment on perceived perjury of a party should perhaps pause, reflect, and then articulate a candid but measured response. The appearance of justice is vitally important to the administration of justice and we counsel judicial restraint in the future. Unfortunately, that did not happen here.

Ronald Edward Williams appeals from the judgment entered following his no contest plea to cultivation of marijuana. (Health & Saf. Code, § 11358.) The imposition of sentence was suspended, and he was placed on formal probation. One of the conditions of his probation was that he serve 365 days in county jail.

Appellant entered his no contest plea after the denial of his Penal Code section 1538.5 motion to suppress evidence.[1] The judge who denied the

---

[1] All statutory references are to the Penal Code unless otherwise stated.

motion, Judge Trice (hereafter the trial court), was subsequently disqualified for bias against appellant, and the case was assigned to a different judge. Appellant then made a motion for a de novo section 1538.5 hearing, which was denied. Appellant contends that the disqualification ruling voids the ruling on the section 1538.5 motion. Therefore, appellant maintains, he was entitled to a de novo section 1538.5 hearing. In addition, he contends that the trial court erroneously denied the section 1538.5 motion. We affirm.

### *Statement of Facts*

Sheriff's helicopter personnel spotted a "marijuana grow" in the Los Padres Forest in northern Santa Barbara County. In response thereto, before sunrise at 5:30 a.m. on August 18, 2004, a team of deputy sheriffs went to a campground area near the "marijuana grow." Their purpose was to eradicate the marijuana plants. It was dark outside, but not "pitch black."

The deputies stood on a paved road by a gate. On the other side of the gate, a dirt road led to the bottom of a hill, and the "marijuana grow" was on the side of the hill. It would have taken a person approximately 45 minutes to an hour to drive from the gate to the bottom of the hill. The dirt road is a "winding" road with "some really tight curves." "Some parts are really narrow, and some areas are . . . steep."

Approximately 5:30 a.m., appellant drove a motorcycle on the paved road toward the deputies standing by the gate. The deputies stopped appellant, who appeared "really nervous." They asked him for identification, but he had none. Appellant said that he was going for a two-hour motorcycle ride before work. Appellant also said that he lived in Pismo Beach and was working on a landscape job in Los Alamos. The deputies asked appellant what was inside his backpack, and he replied that his lunch was there. A deputy asked appellant why he would need his lunch at 5:30 a.m. Appellant "appeared to get a little rattled . . . and stated he meant his breakfast."

Approximately 5:35 a.m., appellant gave the deputies permission to search his backpack. They did so finding clothing with a "growing marijuana odor." They also found "an insect net, drip-line, fittings, and a pair of camouflage pants, camouflage shirt, gloves, and hat." The deputies handcuffed appellant. They told him that if they found evidence linking him to the "marijuana grow," he would be arrested. "If not, he would be released and free to go."

Eight to 10 deputies then drove along the dirt road to the bottom of the hill on which the "marijuana grow" was located. At the bottom of the hill, they found motorcycle tracks that matched the tire tread of appellant's motorcycle. In the area of the "marijuana grow," they found motorcycle gloves that

matched the ones that appellant had been wearing when he was stopped. In addition, they found netting and a hat that matched the netting and hat in appellant's backpack.

It took the deputies about four to five hours to collect evidence and eradicate over 400 plants. At some point between 10:00 a.m. and noon, appellant was formally arrested. He remained handcuffed up until the time of his formal arrest. Appellant then admitted that he and two partners owned the plants and that he expected to earn approximately $100,000 from the grow.

Appellant gave the deputies both verbal and written consent to search his house. He said that he did not want them to get a search warrant. The deputies told appellant that he could be present during the search. He was present and assisted the deputies in the seizure of about 90 marijuana plants and three to four pounds of processed marijuana.

Appellant was the sole witness who testified on his behalf at the section 1538.5 hearing. His testimony was, to say the least, at variance with that of the deputies and as we shall explain, the trial court was not impressed with it.[2]

### Section 1538.5 Ruling and the Judge's Comments

In a 13-page oral ruling, the trial court analyzed the cases relied upon and applied them to the facts as he found them. This transcript reflects a detailed and comprehensive statement of search and seizure law that could serve as a textbook example of how a trial court should proceed.[3] Immediately after denying the section 1538.5 motion, it "switched gears" from scholarly analysis to an appraisal of appellant's character for honesty and veracity. The trial court said that appellant's testimony was "completely unbelievable" and "blatantly false under oath." It went on to say: "[I]t is offensive to the court . . . that [appellant] was willing to testify in this court under oath and blatantly commit perjury. I don't know if the People are interested in pursuing that. . . . It is an issue if [appellant] is ever convicted in this case. I

---

[2] For example, appellant categorically denied telling the deputies that he was the owner of the "marijuana grow" in the wilderness. He also testified that the backpack and its contents did not belong to him. Appellant admitted that it was "quite a coincidence" that (1) the items found in the backpack matched those found at the "marijuana grow" in the wilderness, (2) he was in the vicinity of the "marijuana grow" in the wilderness, and (3) there was a "marijuana grow" at his residence. Even from the cold record, the inference can reasonably be drawn that this was something more than "quite a coincidence." To say that this testimony was "far-fetched" would be an understatement. It could just as easily have been prefaced by the phrase, "once upon a time."

[3] We have utilized the transcript in our analysis of the merits of the section 1538.5 motions. (See, *post,* p. 958 et seq.)

will consider it on the issue of his suitability for probation. [¶] . . . If [appellant] is willing to . . . perjure himself before the very judge who may be called upon some day to issue an appropriate sentence, I question his veracity when he signs a promise to appear. So in that regard I'm going to revoke his own recognizance release." The trial court set bail at $100,000 and appellant was taken into custody.[4]

## Disqualification for Bias

The issues of appellant's release on his own recognizance or on bail and his suitability for probation were not before the trial court. The sua sponte comments thereon could serve as a textbook example of how a trial court should not proceed. The net results of these untimely comments were (1) appellant was remanded to custody until he posted $100,000 in bail and (2) collateral litigation covering judicial bias ensued which delayed the orderly resolution of the underlying criminal case.

Based on the trial court's comments, appellant filed a statement pursuant to Code of Civil Procedure section 170.3, subdivision (c)(1), seeking disqualification for bias. The contested motion was granted by Judge Tangeman. The case was assigned to Judge Duffy, who denied appellant's request for a de novo section 1538.5 hearing, reasoning that there was no evidence that the trial court was biased or prejudiced against appellant before he testified.

## De Novo Section 1538.5 Hearing After Disqualification

"[D]etermination of a section 1538.5 motion at a special hearing in the superior court—whether in the defendant's or in the People's favor—deprives that court of jurisdiction to reconsider the matter . . . ." (*Madril v. Superior Court* (1975) 15 Cal.3d 73, 77 [123 Cal.Rptr. 465, 539 P.2d 33].) Appellant contends that this rule is inapplicable here because The trial court's disqualification voided his ruling denying the section 1538.5 motion. "The acts of a judge subject to disqualification are void or, according to

---

[4] "A trial court's conclusion that a defendant has committed perjury may be considered as one fact to be considered in fixing punishment as it bears on defendant's character and prospects for rehabilitation. [Citation.]" (*People v. Redmond* (1981) 29 Cal.3d 904, 913 [176 Cal.Rptr. 780, 633 P.2d 976].) Generally speaking, such a conclusion is uttered by the trial court at the time of sentencing, not during pretrial proceedings or at trial. We also observe that the trial court may refer a potential perjury case to prosecuting authorities as long as it does so in a neutral way and without interfering with prosecutorial discretion. (*In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28, 38 [33 Cal.Rptr.3d 246].)

Here, the trial court could have exercised judicial restraint and at the same time been totally candid by simply stopping after stating that appellant's testimony was "completely unbelievable." While not music to defense counsel's ears, this would assist counsel in evaluating whether appellant would be believed by a jury.

some authorities, voidable. [Citations.]" (*Christie v. City of El Centro* (2006) 135 Cal.App.4th 767, 776 [37 Cal.Rptr.3d 718].)

The grounds for disqualifying the trial court did not arise until its comments impugning appellant's credibility, which were made immediately after the ruling denying the section 1538.5 motion. The applicable statute on the validity of the section 1538.5 ruling is Code of Civil Procedure section 170.3, subdivision (b)(4), which provides: "If grounds for disqualification are first learned of or arise after the judge has made one or more rulings in a proceeding, but before the judge has completed judicial action in a proceeding, the judge shall, unless the disqualification be waived, disqualify himself or herself, *but in the absence of good cause the rulings he or she has made up to that time shall not be set aside by the judge who replaces the disqualified judge.*" (Italics added.)

Appellant failed to demonstrate good cause for setting aside the trial court's section 1538.5 ruling. As noted by Judge Duffy who replaced the court, no evidence was presented that the trial court was biased against appellant before hearing his testimony. The bias arose as a result of its conclusion that appellant had perjured himself during the section 1538.5 hearing. The trial court lawfully reached this conclusion because it was based on the evidence presented at the hearing.

Appellant argues that Code of Civil Procedure section 170.3, subdivision (b)(4), is inapplicable because it is reasonable to infer that, before the trial court ruled on the section 1538.5 motion, he had already concluded that appellant had perjured himself. Therefore, appellant maintains, "grounds for disqualification arose before the ruling in this case." But in these circumstances the trial court's ruling would still stand because his bias would have stemmed from his evaluation of appellant's credibility at the section 1538.5 hearing. As the trier of fact, the trial court was permitted to make this evaluation. He has a duty "to pass upon the credibility of witnesses . . . ." (*Keating v. Superior Court* (1955) 45 Cal.2d 440, 444 [289 P.2d 209].)

■ The trial court cannot be faulted for carrying out its legal duty, even if it led the court to believe that appellant had committed perjury. The United States Supreme Court has observed: "The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task. . . . 'Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not

form judgments of the actors in those court-house dramas called trials, he could never render decisions.' [Citation.]" (*Liteky v. United States* (1994) 510 U.S. 540, 550–551 [127 L.Ed.2d 474, 114 S.Ct. 1147]; see also *Kreling v. Superior Court* (1944) 25 Cal.2d 305, 312 [153 P.2d 734] ["when the state of mind of the trial judge appears to be adverse to one of the parties but is based upon actual observance of the witnesses and the evidence given during the trial of an action, it does not amount to that prejudice against a litigant which disqualifies him in the trial of the action"]; *Haldane v. Haldane* (1965) 232 Cal.App.2d 393, 395 [42 Cal.Rptr. 828] [" '[A] trial judge will normally and properly form opinions on the law, the evidence and the witnesses, from the presentation of the case. These opinions and expressions thereof may be critical or disparaging to one party's position, but they are reached after a hearing in the performance of the judicial duty to decide the case, and do not constitute a ground for disqualification.' "].)

Here, Judge Tangeman, the judge who decided the disqualification issue concluded that *Keating v. Superior Court, supra*, 45 Cal.2d 440, "is controlling." At oral argument before this court, appellant's counsel alleged that, to affirm the judgment, we "would have to overrule *Keating*."

■ In *Keating* an action for damages was tried to the court without a jury. At the conclusion of testimony, the trial judge accused the defendant of having committed perjury. The judge then orally announced judgment against the defendant in the amount of $35,000. "On appeal by defendant from the adverse judgment, it was held that the issue of liability was correctly determined but that the action must be remanded for retrial of the issue of damages. [Citation.]" (*Keating v. Superior Court, supra* 45 Cal.2d at p. 442.) The defendant filed a statement seeking to disqualify the judge from retrying the damages issue. The defendant alleged that the judge's adverse comments concerning his credibility showed that the judge was biased. The judge struck the statement, and the defendant petitioned for extraordinary relief. Our Supreme Court held that, "where a judge is about to retry a case after having stated during the course of the prior trial that he believes a party has wilfully sworn falsely," he is disqualified from retrying the case "even though his belief [was] founded on the evidence" presented during the prior trial. (*Id.*, at p. 444.)[5]

---

[5] On the other hand, without subjecting himself to disqualification for bias in the event of a retrial, a judge may expressly reject the testimony of a party: "In deciding questions of fact a judge may often reject the testimony of a party, but this does not necessarily indicate that he believes that the party was guilty of deliberate falsification. The rejection of the testimony may have been the result of a consideration of the ability of the party to observe or remember, and in such a situation failure to accept a party's version of the facts does not show that the judge is biased or prejudiced against him." (*Keating v. Superior Court, supra*, 45 Cal.2d at pp. 443–444.)

■ Here, the *Keating* rationale was applied to disqualify the trial court from further proceedings after it had accused appellant of committing perjury during the section 1538.5 hearing. This application of the *Keating* rationale was warranted to assure that appellant would receive a fair trial. "[I]t is 'the right of a litigant to have his cause tried by one who has no preconceived opinion against his veracity which may preclude a full and fair consideration of the facts and the law which are involved therein.' " (*Keating v. Superior Court, supra*, 45 Cal.2d at p. 445.)

■ While *Keating* supports the disqualification of the trial court as to proceedings after the section 1538.5 hearing, it does not support its retroactive disqualification as to the section 1538.5 hearing. *Keating* makes it clear that, despite the judge's finding during the first trial that the defendant had perjured himself, the judge was not disqualified from rendering judgment following that trial: "Nor is a judge disqualified from proceeding to try and decide a case or pass on a motion for new trial because he states during the course of the trial that in his opinion a party has deliberately given false testimony, provided the opinion of the judge is based upon a consideration of the evidence produced. [Citations.] It is the duty of a judge when acting as the trier of the facts to pass upon the credibility of witnesses, and if he believes that a party has testified falsely, and chooses to say so rather than remain silent, he is not disqualified from proceeding to render judgment." (*Keating v. Superior Court, supra*, 45 Cal.2d at p. 444.)

■ Just as the judge in *Keating* was not disqualified from rendering judgment following the first trial, so the trial court was not disqualified from ruling on the section 1538.5 motion despite its expressed belief that appellant had perjured himself during the section 1538.5 hearing. The fair import of the order disqualifying the trial court speaks to *further* proceedings before it, not past proceedings.

### The Trial Court Did Not Err in Denying the Section 1538.5 Motion

### The Detention

■ Appellant unsuccessfully contends that his initial detention at 5:30 a.m. was unlawful. An investigatory stop satisfies the Fourth Amendment "if the officer's action is supported by reasonable suspicion to believe that criminal activity ' "may be afoot," ' [citations]." (*United States v. Arvizu* (2002) 534 U.S. 266, 273 [151 L.Ed.2d 740, 122 S.Ct. 744].) In determining whether the requisite reasonable suspicion existed, "reviewing courts . . . must look at the 'totality of the circumstances' of each case to see whether the detaining

officer has a 'particularized and objective basis' for suspecting legal wrongdoing. [Citations.] This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' [Citations.]" (*Id.*, at pp. 273–274.)

Here, the deputies had reasonable suspicion to believe that appellant was involved in the cultivation of the "marijuana grow." Before sunrise at 5:30 a.m., appellant was riding a motorcycle toward a treacherous dirt road which led to the "marijuana grow." The dirt road was a "winding" road with "some really tight curves." It was extremely unlikely that a law-abiding recreational motorcycle rider would be taking a predawn recreational ride in the dark on a treacherous road.

On the other hand, if appellant were a marijuana grower, it is reasonable to infer that he would cultivate his grow under cover of darkness. Deputy Marino, an expert on "marijuana grows," testified that persons who work in the grows "go up into the canyons on off times, oftentimes at night, early in the morning, to avoid law enforcement detection . . . ."

In addition, the deputies were justified in stopping appellant because of safety concerns. Deputy Marino testified that he would have stopped anyone "from going into an area where we are going to be conducting an operation as dangerous as going into a marijuana field." He explained: "Oftentimes these fields are booby-trapped and there has [*sic*] been numerous shootings involving deputies going in. A lot of times the people in the fields don't know that it is law enforcement. They feel it is other people going in to rip them off and, like the Old West, they get into shoot-outs to protect their crops."

### Prolongation of Detention

Appellant unsuccessfully contends that his detention was unduly prolonged. " '[J]ust as a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope [citation], so may an investigatory detention exceed constitutional bounds when extended beyond what is reasonably necessary under the circumstances which made its initiation permissible.' [Citations.]" (*People v. McGaughran* (1979) 25 Cal.3d 577, 586 [159 Cal.Rptr. 191, 601 P.2d 207].) "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. [Citations.] A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such

cases the court should not indulge in unrealistic second-guessing." (*United States v. Sharpe* (1985) 470 U.S. 675, 686 [84 L.Ed.2d 605, 105 S.Ct. 1568].)

The detention was not unduly prolonged. The deputies "pursued [their] investigation in a diligent and reasonable manner." (*United States v. Sharpe, supra*, 470 U.S. at p. 687.) The detention was necessarily prolonged because of the remote location of the "marijuana grow." It took the deputies "at least an hour" to reach the grow. Once there, it took time for them to search the area and gather the evidence that linked appellant to the grow.

Furthermore, the detention was not unduly prolonged because the deputies had probable cause to arrest appellant after searching his backpack. Inside the backpack they found clothing with "an odor of growing marijuana." One of the deputies—James Wilkinson—testified that he was "very familiar with [the odor] from being in marijuana gardens and performing eradications." This odor, combined with appellant's (1) "really nervous" behavior, (2) unlikely explanation that he was going for a motorcycle ride before work, and (3) apparent intention to drive in the dark along the dirt road that led to the "marijuana grow," "would lead a person of ordinary care and prudence to entertain an honest and strong suspicion" that he was involved in the cultivation of the "marijuana grow." (*People v. Kraft* (2000) 23 Cal.4th 978, 1037 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

### Arrest

■ Appellant contends that he was arrested without probable cause at 5:35 a.m. when he was handcuffed after the deputies had searched his backpack. "Custody determinations are resolved by an objective standard: Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest? [Citations.] The totality of the circumstances surrounding an incident must be considered as a whole. [Citation.]" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403 [42 Cal.Rptr.3d 301], fn. omitted.)

A reasonable person in appellant's situation would not have interpreted the restraints used by the police as tantamount to a formal arrest. The deputies told appellant that, if they found no evidence linking him to the "marijuana grow," he would be released. In any event the deputies had probable cause to arrest appellant when they handcuffed him.

### Consent

Appellant contends that his consents to search his backpack and his house were invalid because they were "the product of unlawful police conduct." But, as discussed above, the deputies acted in a lawful manner.

██ Appellant also contends that his consents were invalid because they were "involuntary as a matter of law." "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 227 [36 L.Ed.2d 854, 93 S.Ct. 2041].) "The question of the voluntariness of the consent is to be determined in the first instance by the trier of fact; and in that stage of the process, 'The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence.' [Citations.]" (*People v. James* (1977) 19 Cal.3d 99, 107 [137 Cal.Rptr. 447, 561 P.2d 1135].)

Substantial evidence supports the trial court's finding that appellant's consents were voluntary. The testimony of the deputies shows that they went out of their way to be courteous. Nothing in their conduct suggests that appellant's consents were obtained through duress or coercion. No evidence was presented that any deputy drew his gun. Although appellant was in custody when he consented to the search of his house, that factor alone did not render his consent involuntary. (*People v. James, supra*, 19 Cal.3d at pp. 109–110.) Nor were appellant's consents involuntary because he was not advised of his right to refuse consent. (*United States v. Drayton* (2002) 536 U.S. 194, 206–207 [153 L.Ed.2d 242, 122 S.Ct. 2105].) Indeed, since the deputies "made no overt or implied threat of force, [their] request for permission to search . . . itself carried the implication that it could be refused . . . ." (*People v. Monterroso* (2004) 34 Cal.4th 743, 758 [22 Cal.Rptr.3d 1, 101 P.3d 956].)

Appellant contends that he was told that, if he did not give consent to the search of his house, "a search warrant **would** be obtained and would be executed in a destructive manner." The record reveals that it was appellant who testified that the deputies had threatened to execute the search warrant in a destructive manner.[6] The trial court expressly discredited appellant's testimony. "[I]t is the exclusive province of the trial judge . . . to determine the credibility of a witness . . . ." (*People v. Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].)

---

[6] Appellant testified that a deputy, using profanity, said that they would kick the doors in and " 'trash your house so hard, it's going to take an hour to put it back together.' "

## *Disposition*

The judgment is affirmed.

Gilbert, P. J., and Coffee, J., concurred.