[No. B219915. Second Dist., Div. Five. Nov. 29, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
TATIANA SMITH, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part III.B.

COUNSEL

Ann Krausz, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon and Sharlene A. Honnaka, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**TURNER, P. J.**—

## I. INTRODUCTION

Defendant, Tatiana Smith, appeals following her nolo contendere plea to a marijuana possession for sale charge. (Health & Saf. Code, § 11359.) Defendant's sole contention on appeal is that her Penal Code section 1538.5 suppression of evidence motion was improperly denied. In the published portion of the opinion, we discuss the propriety of the search of defendant's apartment. We conclude the two police officers and a deputy probation officer acted reasonably while searching her apartment. We affirm the judgment with minor sentencing modifications.

## II. THE SUPPRESSION OF EVIDENCE MOTION HEARING

At approximately 6:00 a.m. on June 4, 2009, Los Angeles Police Officers Timothy Pearce and Daniel Pierce and a Los Angeles County Probation Officer, Alfred Burruel, were conducting a series of probation and parole compliance checks in the Jordan Downs housing development. The officers and Mr. Burruel were members of the L.A. Saves Probation-Parole Task Force. The officers and Mr. Burruel were conducting a probation compliance check on Tyrell Jones, who they believed resided at 9708 South Laurel Place, apartment No. 5. The officers knew that Mr. Jones was on probation and was subject to search and seizure conditions. Mr. Jones's driver's license indicated he lived at 9708 South Laurel Place, apartment No. 5. A field interview card completed on January 26, 2009, listed Mr. Jones's address as 9708 South Laurel Place, apartment No. 5. The field interview card was filled out in the vicinity of the South Laurel Place apartment. Although Mr. Jones had been discharged from parole, he remained on probation. Prior to being discharged

from parole, Mr. Jones had given the listed South Laurel Place apartment as his residence address. In other words, defendant had supplied the South Laurel Place apartment address to the Department of Motor Vehicles, a Los Angeles police officer when the January 26, 2009 field identification card was prepared, and a parole officer. As of December 29, 2008, Mr. Jones had given two different addresses to the probation department. On December 29, 2008, Mr. Jones listed his address with the probation department as 10141 Beach Street in the City of Los Angeles. The other address he had provided as of December 29, 2008, was 723 West Corregidor in the City of Compton. Mr. Jones was placed on probation on October 26, 2007, for domestic violence in case No. TA093035. The victim was defendant and Mr. Jones was ordered to stay away from her.

At 6 a.m., when the officers and Mr. Burruel arrived at the South Laurel Place address, Officer Pearce saw defendant through a window next to the front door. The curtains were open. Defendant appeared to be asleep on a couch. Officer Pearce spoke to defendant through the window. Officer Pearce told defendant that they were present to do a compliance check on Mr. Jones. Defendant said Mr. Jones was not present. Defendant said that Mr. Jones did not live in the apartment. Officer Pearce said, "Well, we'd like to check." Defendant said: "Hold on. Let me get dressed." Officer Pearce saw that defendant was wearing a tank top and dark pants. Defendant left the room and walked out of Officer Pearce's sight towards the back of the apartment.

Thereafter, Officer Pearce heard a noise in what he believed to be the kitchen area of the lower floor. The noise sounded like dishes being moved and a clothes dryer being started. The dryer made a noise as though metal was banging around inside it. Officer Pearce testified the noise was very loud. The noise began only after defendant walked from the front room to the rear of the apartment while Officer Pearce and the others waited outside.

Defendant then opened the door and stepped aside. According to Mr. Burruel, defendant did not block the door in any way. Officer Pearce repeated, "Look, we're just here to check, make sure [Mr. Jones is] not [here]." Defendant responded: "You can check, but [Mr. Jones is] not here. . . . Just me and my kids and my brother."

After entering the apartment, Officer Pearce walked into the kitchen, where the dryer was making the loud noise. Mr. Burruel testified that upon entering the residence, he could smell fresh marijuana. As Officer Pearce walked towards the kitchen, he testified the smell of marijuana became stronger. The smell of marijuana was strongest in the kitchen. Officer Pearce smelled the odor of fresh marijuana and saw a shoebox filled with cash and "one-by-one" individual plastic baggies. The baggies were similar to the ones often used to

package marijuana. Without requesting permission, Officer Pierce opened the dryer door for the sole reason of turning it off. The noise from the dryer "inhibited" the officers from communicating with anybody who was upstairs. Officer Pearce testified, "We still had one male upstairs, according to [defendant] that we needed to call down." Officer Pearce testified that the officers wanted to call down the person who was upstairs out of concern for their safety rather than for them to walk upstairs. The officers wanted to determine the identity of the individual who remained upstairs. It ultimately turned out that defendant's brother in fact was upstairs, as she had said.

When Officer Pierce opened the dryer door, Officer Pearce could see a package of marijuana wrapped in cellophane. In addition, there was change in the dryer along with a "Hello Kitty" bag which contained 22 small 1-inch by 1-inch Ziploc baggies stuffed with marijuana. Defendant admitted the marijuana belonged to her. Defendant was not handcuffed until she was placed in the police car.

## III. DISCUSSION

### A. Suppression of Evidence Motion

Defendant contends the discovery of the marijuana in the dryer resulted from an invalid consent to search. And defendant contends that, even if she gave the officers and Mr. Burruel permission to search for Mr. Jones, they exceeded the scope of her consent when Officer Pierce opened the dryer door. We respectfully reject each of these contentions.

In reviewing a ruling on a suppression of evidence motion, we defer to the trial court's factual findings, when supported by substantial evidence, and view the record in the light most favorable to the challenged ruling. (*People v. Ramos* (2004) 34 Cal.4th 494, 505 [21 Cal.Rptr.3d 575, 101 P.3d 478]; *People v. Weaver* (2001) 26 Cal.4th 876, 924 [111 Cal.Rptr.2d 2, 29 P.3d 103]; *People v. Camacho* (2000) 23 Cal.4th 824, 830 [98 Cal.Rptr.2d 232, 3 P.3d 878]; *People v. Ayala* (2000) 23 Cal.4th 225, 255 [96 Cal.Rptr.2d 682, 1 P.3d 3].) The power to judge credibility, weigh the evidence, and draw reasonable inferences is vested in the trial court. (*People v. Monterroso* (2004) 34 Cal.4th 743, 758 [22 Cal.Rptr.3d 1, 101 P.3d 956]; *People v. James* (1977) 19 Cal.3d 99, 107 [137 Cal.Rptr. 447, 561 P.2d 1135].) We exercise our independent judgment to determine whether, on the facts found and those which are undisputed, the search and seizure was reasonable under the Fourth Amendment. (*People v. Memro* (1995) 11 Cal.4th 786, 846 [47 Cal.Rptr.2d 219, 905 P.2d 1305]; *People v. Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436].)

■ The United States Supreme Court has set forth the constitutional standard for evaluating searches including those conducted pursuant to a

consent: "The touchstone of the Fourth Amendment is reasonableness. *Katz* v. *United States* [(1967)] 389 U.S. 347, 360 [19 L.Ed.2d 576, 88 S.Ct. 507] . . . . The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable. *Illinois* v. *Rodriguez* [(1990)] 497 U.S. 177 [111 L.Ed.2d 148, 110 S.Ct. 2793] . . . . Thus, we have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so. *Schneckloth* v. *Bustamonte* [(1973)] 412 U.S. 218, 219 [36 L.Ed.2d 854, 93 S.Ct. 2041] . . . . The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness— what would the typical reasonable person have understood by the exchange between the officer and the suspect? *Illinois* v. *Rodriguez, supra*, at 183–189; *Florida* v. *Royer* [(1983)] 460 U.S. 491, 501–502 [75 L.Ed.2d 229, 103 S.Ct. 1319] . . . (opinion of White, J.); *id.*, at 514 (Blackmun, J., dissenting)." (*Florida v. Jimeno* (1991) 500 U.S. 248, 250–251 [114 L.Ed.2d 297, 111 S.Ct. 1801].) An otherwise unreasonable search is legal if it is conducted pursuant to a free and voluntary consent. (*People v. Frye* (1998) 18 Cal.4th 894, 989 [77 Cal.Rptr.2d 25, 959 P.2d 183], overruled on a different point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11]; *People v. Memro, supra*, 11 Cal.4th at p. 847.) Here, Officer Pearce asked defendant through an open window for her permission to enter the apartment to see if Mr. Jones was present. After indicating she wanted to get dressed, defendant left the living room. The officers heard noises in the kitchen, including the clothes dryer being turned on. Defendant then returned, opened the door, stepped aside and said: "You can check, but [Mr. Jones is] not here. . . . Just me and my kids and my brother [are upstairs]." Moreover, defendant made no effort to block the doorway—rather she opened the door and stepped aside. This constituted substantial evidence of an apparent voluntary consent to enter. (*People v. Monterroso, supra*, 34 Cal.4th at p. 758; *People v. Williams* (2007) 156 Cal.App.4th 949, 961 [67 Cal.Rptr.3d 711].)

As noted, defendant further argues Officer Pierce exceeded the scope of her consent when he opened the dryer door. (*People v. Jenkins* (2000) 22 Cal.4th 900, 975–976 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Cantor* (2007) 149 Cal.App.4th 961, 965 [57 Cal.Rptr.3d 478].) As previously explained, the legal issue before us is whether the challenged state action, in this case, opening the dryer door to turn it off, was objectively reasonable. Once the dryer door was opened, Officer Pearce testified he could see the marijuana. Defendant does not contend the marijuana was not in plain view once the dryer door was opened. Hence, if Officer Pierce acted reasonably in opening the dryer door, then the observation and seizure of the marijuana by Officer Pearce in plain view was reasonable.

In *People v. Glaser* (1995) 11 Cal.4th 354, 365 [45 Cal.Rptr.2d 425, 902 P.2d 729] (hereafter *Glaser*), a case involving a temporary detention of a person at gunpoint, Associate Justice Werdegar articulated the test to be applied in determining whether there has been a Fourth Amendment violation as follows: "To test the detention against 'the ultimate standard of reasonableness embodied in the Fourth Amendment' ([*Michigan v.*] *Summers* [(1981) 452 U.S. 692,] 699–700 [69 L.Ed.2d 340, 101 S.Ct. 2587]) . . . , we balance the extent of the intrusion against the government interests justifying it, looking in the final and dispositive portion of the analysis to the individualized and objective facts that made those interests applicable in the circumstances of the particular detention. (*Terry*[ *v. Ohio* (1968) 392 U.S. 1,] 21 [20 L.Ed.2d 889, 88 S.Ct. 1868]; *Summers, supra*, 452 U.S. at p. 703 . . . .)"

■ To begin with, we examine the character of the official intrusion. (*Michigan v. Summers, supra*, 452 U.S. at pp. 699–700 (*Summers*); *Glaser, supra*, 11 Cal.4th at p. 365.) The search involves a residence. The right against an unreasonable seizure in the home is at the core of the Fourth Amendment and a warrantless search inside a residence is presumptively unreasonable. (*Groh v. Ramirez* (2004) 540 U.S. 551, 559 [157 L.Ed.2d 1068, 124 S.Ct. 1284]; *Kyllo v. United States* (2001) 533 U.S. 27, 31 [150 L.Ed.2d 94, 121 S.Ct. 2038].) Several factors diminish the intrusiveness of the official action. For example, defendant had consented to a search for Mr. Jones which, at the very least, extended to every room of the residence. Moreover, defendant was not held at gunpoint at anytime and was not even handcuffed until she was placed in the police car; factors relevant to the intensity of the intrusion and objective reasonableness determination. (*Glaser, supra*, at p. 366 [suspect held at gunpoint increased intrusiveness of detention]; *People v. Stier* (2008) 168 Cal.App.4th 21, 27 [85 Cal.Rptr.3d 77] ["[h]andcuffing substantially increases the intrusiveness of a detention . . ."]; *People v. Samples* (1996) 48 Cal.App.4th 1197, 1207 [56 Cal.Rptr.2d 245] [no guns were drawn and the defendant was not handcuffed during the detention thereby reducing its seriousness].) Also, the intrusion occurred inside defendant's residence thereby minimizing the embarrassment inherent in such a situation. (*Glaser, supra*, at pp. 366–367 [temporary detention occurred at back gate of a private residence in the presence of only two others rather than in front of a large number of other persons thereby reducing the stigma or embarrassment of the intrusion]; *People v. Samples, supra*, 48 Cal.App.4th at p. 1207 [detention occurred in darkened cul de sac with a minimum of onlookers].) Finally, the intrusion at issue here, opening a dryer door, is less serious than other privacy invasions.

■ Against the extent of the intrusion, we must balance the state interests in opening the dryer door. The controlling consideration in this case is Officer Pierce's stated justification for opening the door—the need to safely complete the consented to search for Mr. Jones. The United States Supreme Court has

explained in the search warrant context that searching officers may take reasonable steps to secure the premises and insure their own safety. In *Los Angeles County v. Rettele* (2007) 550 U.S. 609, 613–614 [167 L.Ed.2d 974, 127 S.Ct. 1989], the United States Supreme Court held: "In executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search. [*Muehler v. Mena* (2005) 544 U.S. 93,] 98–100 [161 L.Ed.2d 299, 125 S.Ct. 1465]; see also *id.,* at 103 . . . (Kennedy, J., concurring); *Summers, supra,* [452 U.S.] at 704–705. . . ." In *Summers, supra,* at pages 702–703, the United States Supreme Court plainly explained the extent of searching officers authority, "The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." (Accord, *Glaser, supra,* 11 Cal.4th at p. 365.) Now we recognize that *Summers, Glaser* and their progeny, with their analysis concerning the need for searching officers to "exercise unquestioned command of the situation," involve searches pursuant to warrants. This search was not pursuant to a warrant; rather it was a probation search also conducted after defendant gave her consent to enter and look for Mr. Jones. But the officer safety analysis applies equally to a probation or consent search. Common sense tells us that residential searches must be carried out with equal concern for the safety of officers, probationers, parolees, suspects and innocent occupants alike as those conducted pursuant to a search warrant. It bears emphasis that in this case, defendant stated her children were upstairs. Thus, adding to the importance of an orderly and safe environment was the interest in protecting the children who were in defendant's apartment.

Increasing the state interest in stopping the noise (by opening the dryer door) which was interfering with the ability to safely order the persons downstairs was that marijuana and packaging materials had been found when Officer Pearce entered the kitchen. In *Glaser, supra,* 11 Cal.4th at pages 367–368, our Supreme Court explained: " 'In the narcotics business, "firearms are as much 'tools of the trade' as are most commonly recognized articles of narcotics paraphernalia." ' (*Ybarra v. Illinois* (1979) 444 U.S. 85, 106 [62 L.Ed.2d 238, 100 S.Ct. 338] (dis. opn[.] of Rehnquist, J.), quoting *United States v. Oates* (2d Cir. 1977) 560 F.2d 45, 62.) The danger is potentially at its greatest when, as here, the premises to be searched are a private home, rather than a place of public accommodation as in *Ybarra.* '[B]ecause of the private nature of the surroundings and the recognized propensity of persons "engaged in selling narcotics [to] frequently carry firearms to protect themselves from would-be robbers," (*People v. Lee* (1987) 194 Cal.App.3d 975, 983 [240 Cal.Rptr. 32]) the likelihood that the occupants [of a residence] are armed or have ready accessibility to hidden weapons is conspicuously greater than in cases where, as in *Ybarra,* the public freely enters premises where legal business is transacted.' (*People v. Thurman* (1989)

209 Cal.App.3d 817, 824–825 [257 Cal.Rptr. 517].)" (Fn. omitted; see *People v. Ledesma* (2003) 106 Cal.App.4th 857, 862–863 [131 Cal.Rptr.2d 249] [in determining whether sufficient emergent circumstances were present to permit a protective sweep before a warrantless probation search, resident's status as a narcotics offender who appeared to be under the influence was relevant to the risk and reasonableness calculations].) No doubt, when defendant was awakened and asked for consent to search, Officer Pearce was not conducting a narcotics investigation. But by the time the packaged marijuana and cash were initially discovered in the kitchen before the dryer door was opened, viewed objectively, the risks confronting Officers Pearce and Pierce and Mr. Burruel were increased because it was apparent defendant or other persons with access to the apartment were engaged in narcotics trafficking. Additionally, Officers Pearce and Pierce and Mr. Burruel were searching for Mr. Jones, a probationer and former parolee who had been convicted of domestic violence. This increased the risk of violence beyond that present in the case of a search of a narcotics traffickers residence.

Based on the undisputed facts and those established when they are viewed in the light most favorable to the challenged ruling, the intrusion (opening the dryer door) was objectively reasonable. There was evidence of narcotics trafficking in the apartment. Defendant had said her brother and children were upstairs. In addition, Mr. Jones could have been upstairs because he listed defendant's address on his driver's license and when interviewed by the police. Officer Pearce testified that he heard the dryer start when defendant left the living room. The dryer made a loud banging sound as though there was metal inside. Once inside the apartment, the officers followed defendant to the kitchen, where the dryer was located. As noted, Officer Pearce testified: "[M]y partner actually opened the dryer to turn it off because it was inhibiting us communicating with whoever was upstairs. [¶] We still had one male upstairs, according to [defendant], that we needed to call down. And, you know, for our safety we have to call him down, verify who that is." This constituted substantial evidence Officer Pierce reasonably opened the dryer door to stop the very loud noise which inhibited the officers and Mr. Burruel from clearly ordering the individuals, who were upstairs, to walk downstairs in a manner consistent with the safety of all involved in the otherwise lawful encounter. (*Summers, supra*, 452 U.S. at pp. 702–703; *Glaser, supra*, 11 Cal.4th at pp. 367–369.) Defendant's suppression of evidence motion was thus properly denied. No grounds exist to allow defendant to set aside her no contest plea.

### B. Sentencing Issues*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 572.

## IV. DISPOSITION

The order granting probation is modified to reflect the changes specified in the unpublished portion of the opinion but is otherwise affirmed.

Kriegler, J., and Kumar, J,* concurred.

A petition for a rehearing was denied December 20, 2010, and appellant's petition for review by the Supreme Court was denied March 2, 2011, S189628.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.