Filed 12/29/16

**CERTIFIED FOR PUBLICATION**

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SANTA CLARA**

**APPELLATE DIVISION**

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br><br>v.<br><br>REBECCA MASON,<br><br>  Defendant and Appellant. | No. 1-14-AP-001674<br><br>Trial Ct. Case No. C1358231<br><br><br>**OPINION** |

Appellant Rebecca Mason was charged in two misdemeanor counts with driving under the influence of alcohol and driving with a blood alcohol level of 0.08 or more in violation of Vehicle Code sections 23152, subdivisions (a) and (b), respectively. She appeals the denial of her pretrial motion to suppress, challenging the ruling with respect to the warrantless blood draw only. She physically submitted to the blood draw, electing that over a breath test, after first declining submission to a voluntary preliminary alcohol screening and after being told by an officer she was "required" to submit to a chemical test under the implied consent law, but without the officer providing the full implied consent admonishment, including any of the consequences of refusal.

1

After a thorough review of the record, which consists of undisputed facts pertaining to the motion, we hold that notwithstanding California's implied consent law, which we recognize is a factor to be considered in the totality of the circumstances, the People failed to establish that Mason freely and voluntarily consented to the blood draw, as was their burden. While Mason was driving and using the state's roads, whatever "deemed consent" she had given to a blood draw in advance by virtue of the implied consent law and her use of the public roads did not amount on these facts to *actual* free and voluntary consent for purposes of the Fourth Amendment. And even if the scope of any advance express consent given under the implied consent law extended to a waiver of Fourth Amendment rights in a criminal prosecution, a conclusion we find doubtful, there was also a total absence of proof in the suppression hearing that Mason was licensed to drive in California or of the advance express consent she, in particular, is urged to have provided through obtaining a license. This absence of proof precludes the position posited by the People: that she had, in fact, provided advance express consent, subject to her showing that consent was withdrawn. Moreover, under Penal Code section 1538.5, the burden of proof remained with the People to affirmatively show actual free and voluntary consent as an exception to the warrant requirement. While the implied consent law "deems" consent by drivers to a chemical test to have been given, it does not shift the burden in a suppression motion to require a defendant to show that advance "deemed" consent, falling short of actual free and voluntary consent under the Fourth Amendment, has been withdrawn. Accordingly, we reverse and remand with directions to the trial court to grant Mason's motion to suppress the results of the warrantless blood draw.

STATEMENT OF THE CASE

I.      *Factual Background*[1]

On May 2, 2013, around 10 p.m., Campbell Police Officer Daniel Stromska was driving westbound on Civic Center Drive towards Second Street in Campbell. Civic Center Drive is a one-way, westbound street.The officer conducted an enforcement stop on a silver

---

[1] The facts are taken from Officer Stromska's testimony at the motion hearing.  He was the only witness.

2

car that turned eastbound onto Civic Center Drive, thus going the wrong way on that one-way street. Mason was the driver of the car.

The officer approached and asked Mason if she knew why he had stopped her. She responded by acknowledging that she had driven the wrong way on a one-way street, having turned too early while looking for the freeway. During their contact, Officer Stromska smelled an alcoholic odor on Mason's breath, and could see that she had bloodshot and watery eyes. He also noticed her speech was slurred. Officer Stromska asked Mason if she had consumed any alcohol that evening. She said she had had one or two margaritas and had recently left a nearby restaurant, Aqui.

The officer asked Mason to get out of the car to perform field sobriety exercises. He explained and demonstrated three exercises—the horizontal gaze nystagmus, the leg-balance or single-leg stand, and the heel-to-toe line walk—and then had Mason perform each one. According to Officer Stromska, she did not perform the exercises satisfactorily, meaning she showed signs of impairment. The officer noted that horizontal gaze nystagmus was present when Mason's eyes were following the movement of his finger from left to right. She also exhibited "an early onset of nystagmus approximately prior to 45 degrees." The officer did not give further testimony regarding Mason's performance on either the single-leg stand or the heel-to-toe line walk exercises.

Officer Stromska then asked Mason if she would submit to a preliminary alcohol screening (PAS) and told her that this was "an optional test." Mason declined.

Officer Stromska then placed Mason under arrest for driving under the influence of alcohol, handcuffing her in the process. He transported her to the Alcohol Investigation Bureau (AIB), where a blood draw was ultimately performed. Before the procedure, the officer asked Mason if she would submit to either a blood or breath test. He "told her she was required to give one or the other." On cross-examination, Officer Stromska was asked if he had "informed [Mason] that she was obligated to give a blood or breath sample once she was arrested" and he replied, "Correct," meaning yes. When asked, by the trial court, whether he had specifically used the word "require,"i.e., whether he had told Mason she was "required"

3

to provide a blood or breath sample when informing her about the chemical test, Officer Stromska said he could not recall the specific language he had used. But his standard practice in advising a driving-under-the-influence arrestee on the choice of tests is to "let them know that, when requested by an officer, they have a choice of providing either a blood or breath sample, but it is up to them which one they want to provide[.]"

The officer testified that "[d]eclining the [chemical] test is an option" but he did not tell Mason that she could refuse to provide a sample and did not advise her of any consequences of such a refusal. Officer Stromska explained it was his general practice to *not* inform an individual about the consequences of refusing a chemical test unless and until the person has first refused, and that he was under no obligation to "let [Mason] know the admonishment on the back of the "DS-367 DMV form" unless she declined to "provide a sample."[2] In other words, the officer misunderstood, and did not comply with, Vehicle Code section 23612, subdivision (a)(1)(D), which provides that the person "*shall* be told that his or her failure to submit to, or the failure to complete, the required chemical testing will result in a fine, mandatory imprisonment if the person is convicted of a violation of Section 23152 or 23153 …," and the suspension of the person's privilege to operate a motor vehicle for one year, or the revocation for two or three years depending on certain prior Vehicle Code violations. (Italics added.) Nor did the officer comply with Vehicle Code section 23612, subdivision (a)(4), which likewise provides that the officer "*shall* also advise the person that he or she does not have the right to have an attorney present before stating whether he or she will submit to a test or tests, before deciding which test or tests to take, or during the administration of the test or tests chosen, and that, in the event of a refusal to submit to a test or tests, the refusal may be used against him or her in a court of law." (Italics added.)

---

[2] This form is apparently used in connection with administrative proceedings before the Department of Motor Vehicles when a licensed driver is arrested for driving under the influence. It contains the advisements that are not optional but, rather, mandated by Vehicle Code section 23612, subdivisions (a)(1)(D) and (a)(4). But law enforcement officers use and fill it out in connection with the arrest.

Once informed by Officer Stromska that she was required to submit to a chemical test and of her choice between a blood or breath test, Mason opted for a blood test. She did not inquire into other alternatives and did not otherwise verbally or physically resist the blood draw.

Officer Stromska did not attempt to obtain a warrant for the blood draw because he believed "[t]here was no need to." When asked why there was no need for a warrant, the officer explained it was because "there was no need for physical restraints … to obtain the blood sample from the defendant." We take the officer to have meant that in his understanding, a warrant is required for a blood draw only in the event a DUI suspect physically resists the procedure and actual force would then be required to implement it.

After Mason opted for a blood test, the officer requested through dispatch that a phlebotomist meet him at AIB to perform the blood draw. AIB is a secure facility and Officer Stromska said the area seemed clean to him. He was within six to 10 feet when he observed Mason's blood draw and had witnessed "[r]oughly 50 to 70" other blood draws in the past. The officer testified that Mason's blood draw was done consistently with every other blood draw he had observed, though he could not recall the details of this blood draw, including the technique used, the location on Mason's body from where the blood was drawn, how many attempts "at the puncture" were made, or if Mason showed any signs of discomfort.

There was no evidence at the suppression hearing establishing that Mason was a licensed California driver, and thus of any form of advance express consent to a chemical test she, in particular, may have provided in order to obtain a license.

II.     *Procedural Background*

Mason was charged by misdemeanor complaint with two counts—driving under the influence of alcohol and driving with a blood alcohol level of 0.08 or more in violation of Vehicle Code section 23152, subdivisions (a) and (b), respectively. She waived arraignment on the complaint on June 17, 2013, and then filed a motion to suppress evidence under Penal Code section 1538.5 on July 29, 2013, 42 days later.  (Pen. Code, § 1510 [suppression motion may be reviewed pretrial only if the motion was made by the defendant in the trial court

5

within 45 days following arraignment, unless the defendant was unaware of the issue or had no opportunity to raise it].) The suppression motion was later heard and denied by the trial court, which found the detention to be justified by reasonable suspicion and the arrest to be supported by probable cause. As to the blood draw, the court concluded it had been performed in a reasonable manner and, while characterizing the question of consent as a "very close" decision, the court determined that on these facts, Mason had voluntarily consented to the blood draw. This timely pretrial appeal followed.

DISCUSSION

On appeal, Mason challenges only the warrantless blood draw. She contends the procedure was performed in violation of her Fourth Amendment rights because it was conducted without her free and voluntary consent and in the absence of any other exception to the warrant requirement. As we explain, we agree and, accordingly, reverse the trial court's ruling denying suppression of the blood draw evidence.

Given this conclusion, we need not reach Mason's other arguments, including her claim that the blood draw was not performed in a constitutionally reasonable manner.[3]

I.      *Standard of Review*

"The standard of review on a motion to suppress is well established. The appellate court views the record in the light most favorable to the ruling and defers to the trial court's factual findings, express or implied, when supported by substantial evidence. But in determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, the appellate court exercises its independent judgment. [Citations.] Appellate review is confined to the correctness or incorrectness of the trial court's ruling, not

---

[3] We also note that Mason's appellate challenge to the *manner* in which the blood draw was performed was forfeited because it was not presented in her opening brief, instead raised for the first time in her supplemental brief, though this court did not ask for supplemental briefing on that issue. (*People v. Baniqued* (2000) 85 Cal.App.4th 13, 29 [an argument not raised in the opening brief deprives the respondent of an opportunity to answer it and is waived unless good cause is shown for the failure].) Our request for supplemental briefing was limited to the effect, if any, on this case of *People v. Agnew* (2015) 242 Cal.App.4th Supp. 1 (*Agnew*), and *People v. Arredondo* (2016) 245 Cal.App.4th 186 (*Arredondo*), before the grant of review in this latter case on June 8, 2016 (S233582), as well as *Birchfield v. North Dakota* (2016) __ U.S. __ [136 S.Ct. 2160] (*Birchfield*).

the reasons for its ruling. [Citation.]" (*People v. Superior Court (Chapman)* (2012) 204 Cal.App.4th 1004, 1011; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364-365.)

II.     *The People Failed to Justify the Warrantless Blood Draw*

Mason claims the blood draw was a search and seizure covered by the Fourth Amendment, the officer acted without a warrant, and no exception to the warrant requirement was shown. The People concede that a blood draw like the one performed on Mason was a search and seizure under the Fourth Amendment and that there was no warrant. But the People assert a warrant was not needed for the blood draw because the totality of circumstances established that Mason voluntarily consented to the procedure. (*People v. Panah* (2005) 35 Cal.4th 395, 466 [requirement of a search warrant is excused when voluntary consent to search has been given].)

A.     *The People Did Not Show Actual Free and Voluntary Consent*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." (U.S Const., 4th Amend.) The extraction of blood or other materials from a person's body for purposes of chemical testing is a search and seizure within this guarantee. (*People v. Robinson* (2010) 47 Cal.4th 1104, 1119; *Schmerber v. California* (1966) 384 U.S. 757, 770 (*Schmerber*).) Searches conducted without a warrant—" 'outside the judicial process, without prior approval by judge or magistrate' "—are per se unreasonable under the Fourth Amendment, subject only to " 'a few specifically established and well-delineated exceptions.' " (*Arizona v. Gant* (2009) 556 U.S. 332, 338.) A warrantless search not shown to fall within an exception is "presumptively unreasonable," thus violating the constitutional guarantee. (*People v. Toure* (2015) 232 Cal.App.4th 1096, 1103.)

The state bears the burden of establishing the constitutionality of a search conducted without a warrant. (*Coolidge v. New Hampshire* (1971) 403 U.S. 443, 454-455.) Where "the prosecution relies on consent to justify a warrantless search or seizure, it bears the 'burden of proving that the defendant's manifestation of consent was the product of his free will and not

7

a mere submission to an express or implied assertion of authority. [Citation.]' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 341.) Whether "consent was voluntarily given is a question of fact, which depends on the "totality of the circumstances" of the individual case. (*United States v. Drayton* (2002) 536 U.S. 194, 206-207; *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 248-249 (*Schneckloth*); *People v. James* (1977) 19 Cal.3d 99, 106 (*James*).) A court determines whether an officer's belief that he or she had consent to a search or seizure is objectively reasonable under the circumstances; the inquiry is what a reasonable person would have understood by the exchange between the officer and the person providing consent. (*Florida v. Jimeno* (1991) 500 U.S. 248, 251-252; *People v. Jenkins* (2000) 22 Cal.4th 900, 974-976.)

Consent to a search may be express or implied by conduct, including non-verbal conduct. (*People v. Smith* (2010) 190 Cal.App.4th 572, 577 [consent to enter found where officers said through open window they wanted to come inside residence to see if probationer was inside; defendant said, "Hold on. Let me get dressed," after which she opened door and stepped aside]; *People v. Camacho* (2000) 23 Cal.4th 824, 835; *People v. Frye* (1998) 18 Cal.4th 894, 990 (*Frye*), disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Harrington* (1970) 2 Cal.3d 991, 996-997 (*Harrington*), superseded on other grounds as stated in *People v. Coffman* (2004) 34 Cal.4th 1, 116-117 [opening door, stepping back and making welcoming gesture with an arm was non-verbal, or implied in fact, consent]; *People v. Guyette* (1964) 231 Cal.App.2d 460, 464 [subject tossed the officer the key to enter the premises, implying consent to enter].)

That said, the People cannot meet the burden of showing free and voluntary consent by simply demonstrating that a defendant submitted to a claim of lawful authority, as such circumstances may be inherently coercive, thus vitiating consent. (*Bumper v. North Carolina* (1968) 391 U.S. 543, 548-549 (*Bumper*); *Schneckloth, supra,* 412 U.S. at p. 234; *People v. Weaver* (2001) 26 Cal.4th 876, 924; *James, supra,* 19 Cal.3d at p. 106.) The defendant need not be advised of the right to refuse as a prerequisite to a finding of voluntariness. But if so advised, this fact supports that a search was in fact voluntary as a product of free choice and

not coercion. (*Schneckloth, supra,* 412 U.S. at pp. 226-227.) The question of consent most commonly turns on whether the person searched *in fact* manifested consent for it and whether, in view of "the totality of all the circumstances," that consent "was in fact 'voluntary' or was the product of duress or coercion, express or implied." (*Schneckloth, supra*, 412 U.S. at p. 227, italics added.)

In *Bumper*, the police told the owner of a house that they had a warrant to search her house. The owner replied, " 'Go ahead,' and opened the door." (*Bumper, supra,* 391 U.S. at p. 546.) For reasons unexplained, the prosecutor later chose not to rely on the existence of the warrant to justify the search but instead argued that the homeowner had voluntarily given consent to search the house as an exception to the warrant requirement. (*Id.,* fn. 7.) The U.S. Supreme Court ultimately rejected that argument, holding that mere "acquiescence to a claim of lawful authority"—in *Bumper*, a search warrant—does not constitute consent. (*Id.* at pp. 548-549.) The assertion that police were conducting the search under a warrant—one that the prosecution later declined to rely on—vitiated the homeowner's consent to search. Under the circumstances presented in *Bumper*, a reasonable person would not have believed there was an option to decline consent such that any consent given was not free and voluntary. The high court said it this way: "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." (*Id.* at p. 550.)[4]

---

[4] Some cases have characterized the facts in *Bumper* as police having *falsely* told the homeowner they had a warrant. (See, e.g., *Agnew, supra*, 242 Cal.App.4th at p. Supp. 18 [law enforcement "falsely announc[ed]" they had a warrant].) But an actual reading of the case does not suggest this. Instead, the Court describes law enforcement's assertion of a warrant at the homeowner's front door, her affirmative submission in response, and then the prosecution's later reliance on consent instead of the warrant. (*Bumper, supra*, 391 U.S. at p. 546, fn. 7.) As we have noted, this strategy or choice by the prosecution to forgo the warrant is not explained in *Bumper*, though the Court alluded to its potential invalidity or the simple failure by the prosecution to have shown its existence. (*Id.* at pp. 549-550.) But nowhere in the opinion does the Court say or imply that law enforcement's representation to the homeowner that they had a warrant was actually false or that such falsity was key to the no-consent holding.

A similar analysis applies on the undisputed facts of this case. Officer Stromska conveyed to Mason after her arrest—using language he could not specifically recall—that because of California's implied consent law, she was "required" to submit to either a blood or breath sample. This was true in the sense that under California's implied consent law, a driver lawfully arrested for driving under the influence is "deemed" to have consented in advance to a chemical test for the purpose of determining the alcoholic content of his or her blood, upon pain of certain consequences of refusal. (Veh. Code, § 23612, subd. (a)(1)(A).) But the officer's statement was misleading. For constitutional purposes, notwithstanding the consent she may have been "deemed" to have given under the implied consent law—implied in law as distinguished from actual consent—Mason still had a Fourth Amendment right to refuse to submit to chemical testing and bear the consequences of that choice. Under the implied consent law, those consequences include license suspension or revocation, payment of a fine, mandatory imprisonment if convicted of driving under the influence, and use of the refusal against the person in a court of law. (Veh. Code, § 23612, subd. (a)(1)(D) & (a)(4).) And Officer Stromska was obligated by statute to inform her of those consequences, which, as we will get to, are an integral part of the full implied consent admonition and go hand in hand with the "requirement" to submit to a chemical test or refuse and bear the consequences.

True enough, an officer's failure to have strictly provided the full and accurate statutory consequences of refusal, or his or her violation of a defendant's statutory rights under the implied consent law, does not, in and of itself, amount to a constitutional violation. (*People v. Harris* (2015) 234 Cal.App.4th 671, 692 (*Harris*) ["failure to *strictly* follow the implied consent law does not violate a defendant's constitutional rights" (italics added)]; see also *Ritschel v. City of Fountain Valley* (2006) 137 Cal.App.4th 107, 118-119 [in context of civil rights claim].) And the full admonition would not be a prerequisite to a finding of actual voluntary consent. But an officer's failing to give the full and accurate admonition is a consideration in the totality of the circumstances bearing on whether a suspect facing DUI charges *actually* consented to a blood draw for Fourth Amendment purposes. (*Harris supra*,

234 Cal.App.4th at p. 689 [failure to disclose accurate information about potential legal consequences of certain behavior is logical basis for assertion of coercion].)

A different panel of this court's Appellate Division confronted a similar situation in *Agnew.* There, the court found an officer informing a DUI suspect of the "requirement" to submit to a blood-alcohol test under the implied consent law, without also informing of the consequences of refusal, "did not involve the type of coercion or 'claim of lawful authority' demonstrated in *Bumper.*" (*Agnew, supra*, 242 Cal.App.4th at p. Supp. 18 and authorities cited there.) We disagree and conclude that it is not such a leap in the totality of circumstances to equate the "claim of lawful authority" in *Bumper*—there a representation of a warrant that simultaneously induced and vitiated consent—with the representation here, that submission to a chemical test is legally "required" without the accompanying statutory mandate that refusal may lead to certain consequences; both representations imply that the person does not have an actual choice to refuse, at least for Fourth Amendment purposes. (*Agnew, supra*, 242 Cal.App.4th at p. Supp. 18.) The problem is not just the omission of the right to refuse or even the statutory consequences of a refusal, the absence of neither of which would generally amount to a constitutional violation. (*Agnew, supra*, 242 Cal.App.4th at pp. Supp. 11-16.) But it is this lacuna coming after the assertion that submission is "required," a compulsion of mere statutory dignity not negating the constitutional right to refuse, that in this court's view can taint the actual voluntariness of the ensuing consent to a blood draw. The absence of actual consent in these circumstances is even more likely when the assertion of the "requirement" of submission follows the contrasting prior assertion that a PAS test is optional. These collective circumstances entail the assertion of a fact—submission is required—that is or can be misleading for want of communication of other facts—there is a choice to refuse or the specific consequences of refusal that suggest the freedom to choose. This brew of representation and omission is the "claim of lawful authority" affecting the constitutional voluntariness of the ensuing consent given.

Moreover, whether actual free and voluntary consent under the Fourth Amendment has been provided in a particular circumstance is a very different question than whether

11

advance "deemed" consent to a chemical test under the implied consent law would support the imposition of the consequences of refusal in the context of administrative proceedings before the Department of Motor Vehicles. (See Veh. Code §§ 13353, subd. (d)(4) & 13557, subd. (b)(1)(D).) On the question whether a licensed driver's advance "deemed" consent under the implied consent law equates to actual free and voluntary consent to a search and seizure under the Fourth Amendment, we again respectfully part company with what our colleagues appear to have suggested in *Agnew*. There, the court concluded that the defendant facing DUI charges had "already provided advance consent under the implied consent law" and the crux of the issue at the suppression motion was whether this advance consent was shown to have been withdrawn. (*Agnew, supra*, 242 Cal.App.4th at pp. Supp. 14, 18-19.)

This deemed "advance consent" under the implied consent law equating to actual free and voluntary consent under the Fourth Amendment seems derived in *Agnew* on the premise that because driving is a privilege, "it is important to condition that privilege on implied consent to testing if lawfully arrested for drunk driving. By driving on California's roads, [a driver has] accepted that condition of implied advance consent … ." (*Agnew, supra,* 242 Cal.App.4th at p. Supp. 6.) The equation appears further premised on the exercise of the driving privilege being likened to a convicted probationer's advance acceptance of a condition that he or she be subject to search without a warrant or probable cause. (*Id.* at pp. Supp. 6-7.) But this is a false equivalence.

It is true that an advance, blanket consent to search may be effective to waive Fourth Amendment protections in some circumstances, like probation. In that context, a search may be upheld as consensual if it conforms to consent previously given as a probation condition upon conviction of an earlier crime. The rationale here is that a probationer can effectively and expressly waive the full protections of the Fourth Amendment in order to avoid the greater curtailment of liberties that flow from a denial of probation. (See *People v. Robles* (2000) 23 Cal.4th 789, 795 ["person may validly consent in advance to warrantless searches and seizures in exchange for the opportunity to avoid serving a state prison term"]; *People v. Mason* (1971) 5 Cal.3d 759, 766 [when "defendant in order to obtain probation specifically

12

agreed to permit at any time a warrantless search of his person, car and house, he voluntarily waived whatever claim of privacy he might otherwise have had"].) In the probation context, the choice to accept the condition is expressly and voluntarily made in advance and it appears in the record. A defendant not willing to subject himself or herself to the invasion of privacy in exchange for greater liberty than incarceration may decline and receive a probation-denied sentence. But we do not believe the rationale for these searches can be readily extended to the present context.

A criminal defendant accepting probation is explicitly told of, and agrees to submit to, the conditions imposed upon his or her enjoyment of the privilege the state grants by withholding the prescribed punishment for the conviction offense. But no such actual notice or agreement can be found as to many drivers on California's roads; certainly neither appears as part of the record here, as Mason was not shown to be a licensed California driver. And while driving on the public roads has been characterized as a "privilege subject to reasonable regulation, under the police power, in the interest of the public safety and welfare" (*Watson v. Division of Motor Vehicles* (1931) 212 Cal. 279, 283), the state's power to place conditions on that privilege cannot justify constitutional intrusions of the same magnitude as those permitted in granting probation. The alternative to probation is custodial confinement, a severe curtailment of the panoply of rights and liberties enjoyed by persons who have not been convicted of crimes. A grant of criminal probation is thus an " 'act of clemency and grace' " on the state's part given in exchange for the defendant justly being required to assent to diminished liberties. (*People v. Anderson* (2010) 50 Cal.4th 19, 32.)

Operating a vehicle on a public road can hardly be viewed in a comparable light, and it is questionable that the state may flatly prohibit its citizens from driving, as driving is not so much an act at the state's sufferance as a right subject to reasonable regulation. (See *People v. Hyde* (1974) 12 Cal.3d 158, 162, fn. 2, quoting *United States v. Kroll* (8th Cir. 1973) 481 F.2d 884, 886 [" 'Compelling the defendant to choose between exercising Fourth Amendment rights and his right to travel constitutes coercion; the government cannot be said to have established that the defendant freely and voluntarily consent[ed] to the search when to do

otherwise would have meant foregoing the right to travel' "]; see *Missouri v. McNeely* (2013) 569 U.S. __, __ [133 S.Ct. 1552, 1565 (*McNeely*) ["the fact that people are 'accorded less privacy in … automobiles because of th[e] compelling government need for regulation,' does not diminish a motorist's privacy interest in preventing an agent of the government from piercing his skin"].)

But we need not pursue this comparative analysis further, because the probation-search cases rest on the premise that the probationer, in accepting a search condition, "truly consents" to the resulting diminution in Fourth Amendment rights. (*People v. Tyrell* (1994) 8 Cal.4th 68, 81.) Nothing of the kind can be said of a driver to whom consent is merely *imputed* by the implied consent law. Indeed, "implied consent" is a misnomer in this context. As we have acknowledged, consent sufficient to sustain a search may be "implied" in fact as well as explicit, but it is nonetheless *actual* consent, "implied" only in the sense that it is manifested by conduct rather than words. (*People v. Superior Court (Chapman)* (2012) 204 Cal.App.4th 1004, 1012 ["consent to enter and search may be express or implied, and may be demonstrated by conduct as well as words"].) For example, in *Frye, supra*, 18 Cal.4th at p. 990, the defendant's cohabitant impliedly consented to officers' entry when, in response to their question "who had hurt her," she "stepped back and pointed to defendant lying on the couch inside, letting officers step into the apartment to see who she was pointing at. Similarly, the defendant in *Harrington, supra*, 2 Cal.3d 991, 995, stepped aside and held out his arm as an officer walked through the front door. The doctrine is traceable at least as far back as *People v. Wright* (1957) 153 Cal.App.2d 35, 40-41, where the defendant, by inviting officers into his house and leading them to a room containing contraband, waived any objection to a warrantless seizure.

Borrowing from the law of contracts, the consent in these and similar cases is implied "in fact," not "in law."[5] It is inferred from conduct constituting an *actual manifestation* of

---

[5] An "implied-in-fact" contract is an actual agreement manifested not in words, but in the parties' conduct. (Black's Law Dict. (10th ed. 2014) p. 394, col. 2 ["A contract that the parties presumably intended as their tacit understanding, as inferred from their conduct and other circumstances."].) But an "implied-in-law" contract is not a real contract at all. It is

consent. In contrast, the mere operation of a motor vehicle is not a manifestation of *actual* consent to a later search of the driver's person. To conclude otherwise is to adopt a construct contrary to fact. This view of the implied consent law is indeed implicit in Vehicle Code section 23612, subdivision (a)(1)(A)'s own language, which declares that driving is "deemed" to constitute consent. When a rule in law is stated this way—that "A is deemed to be B"—it means that A must be *treated as* B for purposes of the rule, even though *they are not the same thing*. (See Black's Law Dict. (10th ed. 2014) p. 504, col. 2 [defining "deem" as "[t]o treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have"].) It is to acknowledge that although two things may be legally equivalent, they are not equivalent in fact. And as the United States Supreme Court recently observed, while civil penalties and evidentiary consequences are one thing, there "must be a limit to the consequences to which motorists may be *deemed to have consented* by virtue of a decision to drive on public roads," though the Court did not define these limits in the case.[6] (*Birchfield, supra, __* U.S. at p. __ [136 S.Ct. at p. 2185], italics added, citing *McNeely, supra, __* U.S. at p. __ [133 S.Ct. at pp. 1565-1566] and *South Dakota v. Neville* (1983) 459 U.S. 553, 560 (*Neville*).)

We acknowledge that since 1999, California drivers applying for or renewing a license have been required to give their *express* consent to blood alcohol testing. (Veh. Code, §

---

rather a "quasi-contract" imposed upon a party to remedy unjust enrichment or other inequity. (*Ibid*. ["An implied-in-law contract is not actually a contract, but instead is a remedy that allows the plaintiff to recover a benefit conferred on the defendant."]; *Arcade County Water Dist. v. Arcade Fire Dist.* (1970) 6 Cal.App.3d 232, 236 ["actually not a contract at all, but merely an obligation imposed by the law to bring about justice"]; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 1013, p. 1102, italics omitted ["The quasi-contract, or contract 'implied in law,' is an obligation (not a true contract …) created by the law without regard to the intention of the parties … "].)

[6] We think this observation in *Birchfield* would further undercut the premise that a driver provides advance, implied consent that is valid under the Fourth Amendment by exercising the privilege to drive in California and that the relevant analysis then becomes whether one later withdraws that consent by a refusal to submit to chemical testing upon a valid arrest for driving under the influence. (Compare *Birchfield, supra, __* U.S. at pp. __ [136 S.Ct. at pp. 2185-2186] with *Agnew, supra*, 242 Cal.App.4th Supp. at pp. 6-7, 18-19.)

13384, subds. (a) & (b).)[7] Proof of that consent by Mason here would have at least brought the case closer to the probation condition or advance express-consent context. But the People offered no evidence of any advance express consent by Mason or even evidence that she was a licensed California driver. The record thus contains no proof of any advance express consent under Vehicle Code section 13384, the scope of which we would still doubt as automatically encompassing Fourth Amendment rights and concerns that lie beyond the over-the-per-se-limit administrative and evidentiary consequences provided in the implied consent law itself. And this form of consent would naturally not reach persons driving in California without a license, or those driving with an out-of-state license.

The challenges and impracticalities of obtaining *express* advance consent from all drivers under the implied consent law, one might suppose, is the reason the Legislature elected to "deem" the act of driving within the state, in and of itself, the legal equivalent of actual consent. (*Serenko v. Bright* (1968) 263 Cal.App.2d 682, 687 ["It is not the act of obtaining a driver's license which brings the statute into play, but instead the act of driving a motor vehicle upon a California highway"].) But in contrast to express consent, these drivers have *not* consented *in fact* to a search of their persons. They have not been asked to agree, and they have not been told they have a choice or been apprised of the consequences that will be deemed to flow from their conduct. (Cf. *People v. Reyes* (1998) 19 Cal.4th 743, 749 ["Without choice, there can be no voluntary consent to inclusion of [a] search condition"]; *People v. Baker* (2008) 164 Cal.App.4th 1152, 1160, citing *State v. Suazco* (1993) 133 N.J. 315; 627 A.2d 1074, 1078 ["assent to search is meaningless unless consenting party understands right to refuse consent"]; *Katz v. United States* (1967) 389 U.S. 347, 358, fn. 22,

---

[7] This section provides in part: "(a) The department shall not issue or renew a driver's license to any person unless the person consents in writing to submit to a chemical test or tests of that person's blood, breath, or urine pursuant to Section 23612, or a preliminary alcohol screening test pursuant to Section 23136, when requested to do so by a peace officer. [¶] (b) All application forms for driver's licenses or driver's license renewal notices shall include a requirement that the applicant sign the following declaration as a condition of licensure: 'I agree to submit to a chemical test of my blood, breath, or urine for the purpose of determining the alcohol or drug content of my blood when testing is requested by a peace officer acting in accordance with Section 13388 [PAS test] or 23612 [deemed consent] of the Vehicle Code.' "

16

and accompanying text, quoting *Lopez v. United States* (1963) 373 U.S. 427, 463 (dis. opn. of Brennan, J.) ["the very nature of electronic surveillance precludes its use pursuant to the suspect's consent" because it " 'depends on lack of notice to the suspect' "].) The statute by its terms makes their driving conduct the legal equivalent of consent regardless of their actual knowledge, intentions, or understanding. And even if persons are "presumed to know the law" in this respect (see *People v. Harris* (2014) 225 Cal.App.4th Supp. 1, 9, citing *Murphy v. Clayton* (1896) 113 Cal. 153; *People v. Munroe* (1893) 100 Cal. 664, 670; *Bank One Texas v. Pollack* (1994) 24 Cal.App.4th 973, 981), the relevant mental condition is still only imputed to the subject by operation of law—the same thing as saying that a person is "deemed" to have such knowledge and has thereby been "deemed" to have consented.

We do not think that consent of this kind can be characterized as "free []" (*People v. Michael* (1955) 45 Cal.2d 751, 753), or " 'knowingly and intelligently made' " (*People v. Bravo* (1987) 43 Cal.3d 600, 605, quoting *People v. Myers* (1972) 6 Cal.3d 811, 819.) It cannot be "voluntarily given." (*Bumper v. North Carolina, supra*, 391 U.S. at p. 548.) Nor can it ever be tested for "duress or coercion." (*Schneckloth, supra*, 412 U.S. at p. 227.) In short, it is not real or actual consent *in fact* for purposes of the Fourth Amendment, though it may be perfectly fine for purposes of administrative proceedings involving forfeiture of driving privileges under the implied consent law upon a refusal to submit to a duly requested chemical test. (See *Hughey v. Dept. of Motor Vehicles* (1991) 235 Cal.App.3d 752, 757 (*Hughey*) [statute intended to "permit a driver to refuse to be tested," while "exact[ing] a penalty for refusal"].)

"The immediate purpose of [the implied consent law] is to provide an incentive for voluntary submission to the chemical test and to eliminate the potential for violence inherent in forcible testing. [Citation.] The ultimate purpose is to deter drinkers from driving, thereby reducing the carnage on our highways. [Citation.]" (*Hughey, supra*, 235 Cal.App.3d at p. 757.) The statutory scheme grew out of a legislative perception that while warrantless, forcible blood draws were then considered lawful pre-*McNeely*, the per se dissipation of alcohol in the blood stream furnishing categorical exigency in every case under the widely

17

accepted but erroneous application of *Schmerber*, " 'such an episode remains an unpleasant, undignified and undesirable one.' [Citation.]" (*Hernandez v. Department of Motor Vehicles* (1981) 30 Cal.3d 70, 77.) Therefore, "the Legislature sought to obviate these consequences for the driver and 'avoid the possible violence which could erupt if forcible tests were made upon a recalcitrant and belligerent inebriate' [citation], while at the same time preserving the state's strong interest in obtaining the best evidence of the defendant's blood alcohol content at the time of the arrest. Thus, 'the Legislature devised an additional or alternative method of compelling a person arrested for drunk driving to submit to a test for intoxication, by providing that such person will lose his automobile driver's license for a period of six months if he refuses to submit to a test for intoxication. The effect of this legislation is to equip peace officers with an instrument of enforcement not involving physical compulsion.' [Citation.]" (*Ibid*; see *Quintana v. Municipal Court* (1987) 192 Cal.App.3d 361, 368 [statutory purpose is "obviously thwarted by the inebriated driver who refuses the test," thereby compelling officers "to risk the possible violence of a forcible test or to forego the best evidence of intoxication"].)

As we've noted, toward these ends, Vehicle Code section 23612, subdivision (a)(1), posits a "deemed" consent on the part of all drivers and then imposes administrative penalties, as well as enhanced punishment for any qualifying criminal conviction, on one who "refuses … to submit to, or fails to complete," the test to which the driver is already deemed to have consented. (Veh. Code, § 13353, subd. (a) [suspension or revocation of license, depending on prior offenses]; see *id.* subd. (b) [lifetime disqualification from driving for refusal on second occasion]; *id*., § 23577 [mandatory "imprisonment … in the county jail" for conviction after willful refusal of request]; *id*., §§ 23538, subd. (a)(1), 23577, subd. (a)(1) [mandatory fine].) Of course, to be effective, an incentive or deterrent must be known to the actor. So the statute directs officers to tell the driver "that his or her failure to submit to … the required chemical testing will result in a fine, mandatory imprisonment if … convicted of a violation of Section 23152 or 23153," as well as suspension of driving privileges. (Veh. Code, § 23162, subd. (a)(1)(D).) A driver must also be informed of a consequence arising entirely outside the act,

18

namely that evidence of a refusal to submit "may be used against him or her in a court of law." (Veh. Code, § 23612, subd. (a)(4); see *Neville, supra,* 459 U.S. at p. 564.) Such a warning is required only by statute, not by constitutional jurisprudence. (*Neville, supra*, at pp. 565-566.) But the difficulty of the choice, made so by the negative consequences of refusal under the implied consent law, does not render actual consent a constitutional nullity by coercive effect. (*Harris, supra,* 234 Cal.App.4th at pp. 687-689 and cases gathered there.)

While this statutory "deemed" consent may be sufficient where the issue is whether the administrative consequences of refusal to consent are properly imposed (*Hughey, supra*, 235 Cal.App.3d at p. 754 [DMV properly revoked driver's license for express refusal to consent; court did not consider constitutional issues]), a state legislature does not have the power to "deem" into existence "facts" operating to negate individual rights arising under the U.S. Constitution. (See U.S. Const., art. VI, cl. 2 [Supremacy Clause]; *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137, 177-180; *Younger v. Harris* (1971) 401 U.S. 37, 52 ["a statute apparently governing a dispute cannot be applied by judges, consistently with their obligations under the Supremacy Clause, when such an application of the statute would conflict with the Constitution"].) A statute attempting such a feat would be a "nullity." (*Gibbons v. Ogden* (1824) 22 U.S. (9 Wheat.) 1, 210-211.) Accordingly, whatever effect advance "deemed" consent may have under the implied consent law in the administrative context, that law does not make the results of a chemical test *admissible in a criminal prosecution,* without a warrant or proof of circumstances establishing an exception to the warrant requirement. Nor does it even purport to. In contrast, such results may be admissible in administrative license-revocation proceedings whether or not the dictates of the Fourth Amendment have been observed. (See *Park v. Valverde* (2007) 152 Cal.App.4th 877, 887.)

The United States Supreme Court in *McNeely,* which principally held that the natural dissipation of intoxicating substances in the bloodstream did not constitute a per se, categorical exigency, did cite the states' "broad range of legal tools" available "to enforce their drunk-driving laws and to secure BAC evidence without undertaking warrantless nonconsensual blood draws," referring to implied consent laws. (*McNeely, supra*, __ U.S. at

19

p. __ [133 S.Ct. at p. 1566] (plur. opn. of Sotomayor, J.).) The Court explained that these laws "require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk driving offense." (*Ibid*.) The laws also "impose significant consequences when a motorist withdraws consent; typically the motorist's driver's license is immediately suspended or revoked, and most States allow the motorist's refusal to take a BAC test to be used as evidence against him in a subsequent criminal prosecution." (*Ibid*; but see *Birchfield, supra*, __ U.S. at p. __ [136 S.Ct. at pp. 2185-2186] [motorists cannot be deemed under implied consent laws to have consented to a blood test on pain of committing an independent crime].) But the Court did not suggest that a statute explicitly imputing consent to drivers—as California's does—would sustain a warrantless blood draw of its own force. Nor did the Court in *McNeely* address the effect of implied consent laws on the Fourth Amendment rights of a driver not otherwise shown to have *expressly* consented or refusing to consent.

Navigating the intersection of the implied consent law in California and the Fourth Amendment after *McNeely*, the Court of Appeal in *Harris*, *supra*, 234 Cal.App.4th 671, held that the defendant there had *actually* consented to a blood draw. After the deputy arrested Harris on suspicion of driving under the influence of a drug, the deputy "told [him] that he did not have the right to talk to a lawyer when deciding whether to submit to a chemical test, that his driver's license would be suspended if he refused to submit to a chemical test, and that his refusal could be used against him in court." (*Id.* at p. 690.) The defendant in *Harris* "responded, 'okay,' and … at no time did [he] appear unwilling to provide a blood sample. [The deputy] also testified that he observed a phlebotomist draw defendant's blood, and that defendant did not resist or say, 'no, I don't want to do this.' " (*Ibid.*) The *Harris* court concluded the evidence before it "demonstrate[d] that defendant verbally agreed to a blood test after being admonished by [the deputy] under the implied consent law, and that he did not verbally refuse to give a blood sample or demonstrate a desire to withdraw his consent either verbally or by physically resisting the phlebotomist's attempt to draw his blood." (*Ibid.*)

*Harris* did *not* hold that advance "deemed" consent under the implied consent law itself furnishes Fourth Amendment consent in a criminal prosecution. Nor did it hold that a statement by an officer that submission to a chemical test is required, without relaying *any* of the consequences of refusal, does *not* amount to a claim of lawful authority vitiating resulting consent as in *Bumper*. Instead, the court held that in the totality of circumstances of that case, which included the officer's statement that submission to a chemical test was "required," followed by the advisements that Harris did not have the right to talk with a lawyer when deciding whether to submit to the test, that refusal to submit would result in the suspension of his driver's license, and that the refusal could be used against him in court (*Harris, supra,* at pp. 690-692), Harris had provided *actual*—free and voluntary—consent to the blood draw, satisfying the Fourth Amendment. Although the implied consent admonishments provided by the officer were not perfect, they nonetheless sufficiently conveyed the existence of a choice, albeit a difficult one. (*Ibid* [admonition, though not entirely accurate, was not patently false and did sufficiently inform defendant that his license would be suspended if he refused].) As noted, the court also concluded that just because the "motorist is forced to choose between submitting to the chemical test and facing serious consequences for refusing to submit" under the implied consent law, this choice "does not in itself render the motorist's submission" coerced or otherwise invalid for purposes of the Fourth Amendment, a conclusion with which we agree. (*Id.* at p. 689.) But this is a different question than whether an officer's advisement that a chemical test is "required," when unaccompanied by *any* statutorily mandated consequences of refusal that would suggest a real choice, amounts to a claim of lawful authority, potentially vitiating a finding of actual consent to a resulting blood draw.

To recap, we have concluded that advance "deemed" consent under the implied consent law cannot be considered actual Fourth Amendment consent. We have also concluded that the scope of advance express consent under the implied consent law may not necessarily extend to Fourth Amendment considerations in a criminal prosecution, and that, in any event, no such advance express consent was shown here. Finally, we have concluded that, depending on the totality of the circumstances, a representation by an officer that submission to a

21

chemical test is "required" under the implied consent law without reference to *any* of the consequences of refusal such that the substance of what is conveyed is that there is no actual choice to refuse may amount to a claim of lawful authority vitiating consent for Fourth Amendment purposes.

Here, Officer Stromska did not claim he had a warrant, like in *Bumper*. But his statements of legal compulsion to Mason in combination with other factors, like his having failed to provide *any* of the statutory admonishments about the consequences of refusal and the absence of any evidence at the hearing of the consent Mason was argued to have given in advance or that she had actual advance notice of the consequences of refusal, mean that her choice of a blood test over a breath test, and her compliance with the procedure, do not establish her *actual* free and voluntary consent under the Fourth Amendment. This is so notwithstanding whatever advance consent was "deemed" under the implied consent law.

Further bearing on the totality of circumstances here is the larger context in which the officer made his statements about the blood draw. There is no dispute that Mason was under arrest and had been transported in a police vehicle to a secure, law enforcement facility. Again, she was not asked for her permission to conduct a chemical test, nor was she advised of any of her rights concerning it—rather, she was informed that she *must* submit to a blood or breath procedure and had the option to choose which of the two would occur. Under the totality of these circumstances, that Mason elected a blood test over a breath test and did not physically or verbally resist the procedure does not establish true consent because a reasonable person in this situation would not have believed that resistance or refusal was an option and, further, would have perceived that the procedure was compelled under a claim of lawful authority. (See *Bumper*, *supra*, 391 U.S. at p. 550.) "The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." (*Ibid*.) And although having been informed either of the right to refuse or the consequences of refusal is not required to find voluntary consent, here, the statement that submission was required together with the absence of the mandated full advisement, coupled with Mason's refusal to submit to a PAS test when told that was an option (Veh. Code §

22

23162, subd. (i)), mean that in the totality of these circumstances, the People failed in their burden to show Mason's actual free and voluntary consent for the blood draw.

The People attempt to distinguish *Bumper*, but their arguments miss the mark. As we've noted, there, the homeowner's consent to search was not valid in the end because a reasonable person presented with a search warrant would not have believed there was an option to decline consent, thus vitiating whatever consent was given. The same is true here, based on the totality of the undisputed facts in the record. While the officer could not recall the exact language he used, his testimony made it clear that, with whatever words he said, he conveyed to Mason that she was legally *required* to provide a blood or breath sample, that she had no option to decline to give one or the other, and that the only choice available to her was to decide which one. And, contrary to the People's assertion, this advisement was inaccurate—and not insubstantially so. As we have shown, California's implied consent law provides that "[t]he person *shall* be told" about the consequences of refusal, thus informing the person that he or she does indeed have a choice to submit or to refuse and bear the consequences. (Veh. Code, § 23612, subd. (a)(1)(D), italics added.) Officer Stromska mentioned not a single repercussion of a choice to refuse a chemical test, and in fact misunderstood his statutory obligation to provide this information before, not after, a choice to submit or refuse. In the context of the Fourth Amendment, the information he provided was thus inaccurate to the extent that what he entirely omitted rendered what he did say misleading, at least for Fourth Amendment purposes as Mason maintained a constitutional right to withhold consent to the blood draw. (See, e.g., Civ. Code § 1710, subd. (3) [actionable deceit includes the suppression of a "fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact"].) The circumstances are particularly stark here, where the officer told Mason that she could refuse the voluntary PAS test, and she did just that, in contrast to his subsequent representation, which was that she was legally "required" to submit to a chemical test.

The People also look to *Harris* for support. But *Harris* offers none. There, unlike here, the conduct of the officer seeking consent for the blood draw did not, in effect, announce that

the defendant had no right or choice to refuse to submit to a chemical test. To the contrary, the deputy in *Harris* substantially informed the defendant of the consequences of refusing to submit to the chemical test under the implied consent law, thus conveying, albeit impliedly, that refusal was an option. (*Harris, supra,* 234 Cal.App.4th at pp. 690-692.) In finding actual, voluntary Fourth Amendment consent, the *Harris* court underscored this, even if the advisement given was not entirely perfect or complete. Because there was substantial compliance, the lack of perfection or completeness of the advisement did not impair the conveyance of an actual choice. In contrast, Officer Stromska told Mason her submission was required and then omitted any mention of the consequences of refusal, thus suggesting it was *not* an option. The officer indeed testified that he *never* complied with the implied consent law by providing the full advisement, unless and until a suspect exercised the choice to refuse, arguably someone less in need of being informed there is a choice at hand.

On the totality of these circumstances, we conclude the People failed to show that Mason actually—freely and voluntarily—consented to the blood draw performed on her. It was their burden to show that her consent was the product of her free will and, further, that any consent to the procedure given was *not* a mere submission to an express or implied assertion of authority. In the absence of proof of her actual free and voluntary consent, the blood draw violated Mason's Fourth Amendment rights. We further conclude that suppression of the results of the blood draw is warranted, given Officer Stromska's stated standard practice of failing to comply with the implied consent law by providing suspects under arrest for driving under the influence with the full statutorily mandated advisement of the consequences of refusal of a chemical test, unless and until a suspect refuses.

B. *There is No Other Applicable Exception to the Warrant Requirement*

The People do not attempt to justify the warrantless blood draw on any other basis except Mason's purported consent. Nor does our review of the record indicate that any other exception to the warrant requirement would apply.

## DISPOSITION

The trial court's ruling, to the extent it denied the suppression motion as to the blood draw evidence based on consent as an exception to the warrant requirement, is reversed. The trial court is directed to enter a new order granting the motion to suppress the evidence obtained as a result of the warrantless blood draw.[8]

_____
Williams, J.
Presiding Judge, Appellate Division

WE CONCUR:

_____
McKay McCoy, J.
Judge, Appellate Division


_____
Weinstein, J.
Judge, Appellate Division



Trial Court:                              Santa Clara County Superior Court,

Superior Court No. C1358231

---

[8] Observant readers will note our homage in this opinion to the Sixth District Court of Appeal's opinion in *Arredondo, supra*, 245 Cal.App.4th 186, authored by Presiding Justice Rushing, which by the grant of review by the California Supreme Court on June 8, 2016, was effectively depublished. This was before the recent changes to rules 8.1105(e) and 8.1115 of the California Rules of Court, which now allow citation to a published opinion as to which review was granted on July 1, 2016, or after, for persuasive as opposed to authoritative value, unless the Supreme Court orders otherwise in a particular case. We could not have articulated the analysis set forth in *Arredondo* any better and it is fitting for revival here, even if only for persuasive value. It is important to note also that the Supreme Court's decision in *Arredondo* would likely affect the outcome of the present case, in that the issues on review in that case, as limited by the Court's order granting review and as described on the California Courts' website, include "Did law enforcement violate the Fourth Amendment by taking a warrantless blood sample from defendant while he was unconscious, or was the search and seizure valid because defendant expressly consented to chemical testing when he applied for a driver's license (see Veh. Code, § 13384) or because defendant was 'deemed to have given his consent' under California's implied consent law (Veh. Code, § 23612)?" (See http://appellatecases.courtinfo.ca.gov/search/case/mainCaseScreen.cfm?dist=0&doc_id=2137802&doc_no=S233582 as of Dec. 24, 2016.)

Trial Judge: Hon. Lori E. Pegg

Counsel for Plaintiff/Respondent,
The People: Jen Jiang, Deputy District Attorney

Counsel for Defendant/Appellant,
Rebecca Mason: Donald Gray Drewry