Filed 5/28/24  P. v. Torres CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAFAEL TORRES,<br><br>    Defendant and Appellant. | B322436<br><br>(Los Angeles County<br>Super. Ct. No. BA037099) |

APPEAL from a postjudgment order of the Superior Court of Los Angeles County.  Eleanor J. Hunter, Judge.  Affirmed.

Joanna Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Jonathan J. Kline and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Rafael Torres appeals the denial of his petition for resentencing under Penal Code[1] section 1172.6 (former § 1170.95[2]) following an evidentiary hearing. Appellant contends: (1) the superior court violated appellant's due process rights to a fair trial by engaging in a lengthy, adversarial and accusatory cross-examination of appellant during the evidentiary hearing, thereby crossing the line from neutral arbiter to advocate for the People; and (2) the evidence is legally insufficient to support the superior court's finding that appellant acted with reckless indifference to human life as a major participant in the burglary. We reject appellant's contentions and affirm the denial of his section 1172.6 petition.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

### A. *The burglary of the Rhew home and Maria Figueroa's murder*

Maria Figueroa worked as a live-in housekeeper for the Rhew family. Around 1:00 in the morning on April 9, 1991, Mr. and Mrs. Rhew were awakened by a sound coming from Maria's bedroom. Mr. Rhew opened his bedroom door and called out to Maria. He heard her say, " 'No, no,' " in a terrified voice, and then heard three gunshots. Moments later Mrs. Rhew told her husband she saw someone running away from their house.

---

[1] Undesignated statutory references are to the Penal Code.

[2] Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

[3] The following factual summary is based on the trial transcript, which was admitted at the section 1172.6 evidentiary hearing as court exhibit 1.

2

Mr. Rhew called 911, and police arrived to find Maria lying on her stomach in the hallway. She had suffered two fatal gunshot wounds: One bullet penetrated her chest, passed through her lung, and lodged in her spine; the other bullet struck her back and appeared to have been fired from close range. There were two bullet casings on the floor near Maria's body and another on the floor in her bedroom. A bullet was embedded in the bedroom door. All three bullets were determined to have been fired from a .25-caliber semiautomatic pistol.

Mr. Rhew discovered that his audio system, a stereo cabinet, and a large television were missing from his living room. Police found the television and stereo equipment under a cardboard box in the backyard of a neighboring house and set up a surveillance post to monitor the area. Around noon on April 9, 1991, officers observed appellant peer over a wall and look in the direction of the hidden property. Appellant returned around 8:00 that evening. He jumped over the wall, walked directly to the cardboard box, and began removing the items that had been piled on top of the box. The officers approached appellant, yelling, " 'Police, stop,' " and " 'Police officer[s], don't move.' " Appellant looked at the officers, who were wearing Los Angeles Police Department windbreakers, and immediately fled. Police set up a perimeter, and eventually appellant was apprehended and taken into custody.

As he ran away from the officers, appellant dropped a pair of canvas gloves. Both gloves tested positive for gunshot residue, and human blood on the left glove was identified as type "O"—Maria's blood type. (Appellant's blood is type "B.")

In an interview with police, appellant claimed he was at home all night after 9:00 p.m. on April 8, 1991. The next

3

morning he went to check on some property he was told "had been stolen by three or four Black dudes."  He explained that he had returned that night because he was just watching the property for his friends.  He ran away when people with flashlights burst out and began shouting, but he claimed he did not know they were police officers.

About an hour into the interview, appellant asked to call his mother.  A detective dialed the number he gave her, handed him the receiver, and stood by while appellant spoke to someone on the phone.  During the call, another detective overheard appellant say in Spanish, " 'take it out.' "

While appellant was being interviewed, his apartment was under police surveillance.  At some point, appellant's mother, a sister, and Irving Davila were seen leaving the apartment.  Shortly thereafter, police observed another sister leave the apartment and walk up the stairwell that led to the roof before returning to the apartment.  Police followed the woman's path to the roof, where they found the murder weapon hidden under a mound of gravel.  Appellant continued to deny any knowledge of a weapon.  But after the interview had ended, appellant asked to speak with police again.  This time, appellant said that two of his friends—"Wicked" and "Lamont"—had broken into a house about a block away from appellant's apartment and needed help removing the stolen property from the house.  Appellant had helped them remove the property, acted as a lookout, and helped them hide the stereo equipment under a box.  According to appellant, after they had hidden the stolen property, Wicked and Lamont decided to go back to the house and line up the residents to rob them of their jewelry.  About 10 minutes later, Wicked came running back to appellant's apartment and handed him a

4

small .25-caliber pistol, which he told appellant was "hot." Davila instructed appellant to hide the gun, and appellant obliged, burying it in a bag under some gravel on the roof of his building.

Based on information appellant provided during the interview, police interviewed Marcus "Wicked" Perryman, his brother Lamont Perryman, and their mother. Police found no evidence to support appellant's claim that either Marcus or Lamont was in any way involved in the Rhew burglary or Maria's murder.

## B. *The attempted murder of Chang Lee*

In December 1989, appellant threatened Chang Lee with an 18-inch metal pipe and demanded Lee's money in the parking garage of Lee's apartment building. The next day, Lee's neighbors caught and restrained appellant in front of the apartment building. While waiting for police to arrive, appellant told Lee he was going to kill him. Appellant was charged in juvenile court with the robbery, and at the adjudication Lee identified him as the perpetrator. The juvenile court sustained the petition against appellant. After Lee had testified, appellant again threatened to kill him.

A year later, on December 4, 1990, Lee heard his car alarm and went to the parking garage to investigate. As Lee was inspecting his car he turned to see appellant pointing a gun at him from behind a low brick wall. Appellant shot Lee in the neck and arm. Lee identified appellant as the shooter in a photographic lineup and also at trial.

No expended shell casings from the shooting were found in the parking garage immediately after the shooting, but a renewed investigation in March 1992 resulted in the recovery of two .32-caliber shell casings from the other side of the brick wall.

It was later determined that these casings had come from a .32-caliber Colt semiautomatic pistol.

### C. *The robbery of Toni Delliquadri*

On February 6, 1991, around 8:30 p.m., Toni Delliquadri pulled her car into the garage at her home. As she opened her car door, she heard a voice behind her say, " 'Don't fucking move.' " The person instructed her to get out of the car and give him her purse; if she screamed he would " 'blow [her] fucking brains out.' " When Delliquadri handed over the purse, she saw appellant at the entrance to the garage pointing a gun at her. With the gun trained on Delliquadri, appellant took the purse, walked backward down the driveway, and ran away. Delliquadri identified appellant in a photographic lineup and in court as the man who had robbed her.

When police searched appellant's apartment on April 10, 1991, following Maria's murder, they found Delliquadri's wallet hidden behind the sink in the bathroom.

### D. *The vehicle stop in Beverly Hills*

In the early evening of February 9, 1991, two months after the attempted murder of Lee and three days after the Delliquadri robbery, Beverly Hills Police Officer Sean Dexter was on patrol when he observed a Cadillac driving toward him roll through a stop sign. The officer saw two people in the Cadillac as it drove past his patrol car. As Officer Dexter was making a U-turn to conduct a traffic stop, he heard a gunshot from the direction of the Cadillac. Officer Dexter detained Davila, who was driving, and appellant, the passenger in the front seat. The officer then traced the route of the Cadillac and found two handguns and an expended .380-caliber shell casing near the sidewalk. One was a loaded .32-caliber Colt semiautomatic pistol, and the other was

an Excam .380-caliber semiautomatic pistol.  The location of the guns suggested both had been thrown from the passenger side of the Cadillac, and the Excam appeared to have discharged on impact with the ground.

The .32-caliber Colt was later determined to be the firearm used in the Lee shooting.

### E. *Appellant's conviction*

Appellant was convicted by jury in 1994 of the first degree murder of Maria Figueroa (§ 187, subd. (a); count 1), the first degree residential burglary of the Rhew home (§ 459; count 2), the second degree robbery of Delliquadri (§ 211; count 3), and the attempted willful, deliberate and premeditated murder of Lee (§§ 664/187, subd. (a); count 4).  The jury found that the murder occurred during the commission of a burglary (§ 190.2, subd. (a)(17)), appellant personally used a firearm during both the robbery and attempted murder (§ 12022.5), and appellant intentionally inflicted great bodily injury during the attempted murder (§ 12022.7).  However, the jury found not true the allegations that appellant personally used a firearm in the burglary and murder.  The trial court sentenced appellant to state prison for a term of life without the possibility of parole for the murder, plus 11 years 4 months on counts 2 and 3, plus 7 years to life for the attempted murder.

This Court affirmed the judgment in appellant's direct appeal.

### F. *The section 1172.6 evidentiary hearing and the superior court's findings*

Appellant filed his petition for resentencing in 2019.  At the evidentiary hearing, appellant testified and the superior court examined him at length.  The court found that appellant had lied

7

throughout his testimony. The superior court concluded that appellant was a major participant in the burglary who acted with reckless indifference to human life. In support of the finding, the court cited its consideration of the trial transcripts, including appellant's testimony at the hearing on his suppression motion, the jury instructions given, the verdict forms, and the preliminary hearing transcript, as well as its credibility finding. On that basis, the superior court denied appellant's section 1172.6 petition for resentencing.

## DISCUSSION

I. **The Superior Court's Examination of Appellant During the Evidentiary Hearing Did Not Violate Due Process**

A. *Relevant background*

At the evidentiary hearing appellant testified that he had nothing to do with planning the burglary of the Rhew residence, but only participated shortly after 11:00 that night by helping to remove property from the home Davila had already burglarized. Appellant claimed he heard no voices or gunfire while he was inside the residence with Davila. He also denied carrying a firearm that night, but he knew Davila had a loaded gun with him. Appellant testified he was unaware of Davila hurting anyone during the burglary or ever using a firearm in the commission of any crime, and he did not know where Davila had obtained his gun. Appellant admitted that after removing a television and stereo equipment from the house, he helped Davila hide it, but claimed that was the extent of his involvement with the crime.

On cross-examination, appellant acknowledged the murder weapon had been found on his roof, but he denied calling his

mother or asking anyone to dispose of the gun. Appellant also disputed that the glove that he dropped had blood and gun residue on it. He maintained he never went to Maria's room, and had no contact or interaction with her at any time that night. Appellant further denied that he robbed Lee or threatened to kill him, and asserted that he was falsely accused and convicted of that robbery. He also denied shooting Lee in the throat.

The superior court then undertook an extensive examination of appellant during which he admitted lying to the police, and repeatedly contradicted or disputed evidence presented at trial. Appellant told the court that "Wicked" was actually Davila, but he admitted that in trying to "defend[ ] Irving [Davila]," he had made up Lamont's involvement and "creat[ed] stories" about Lamont planning the burglary, going into the house, stealing the property, and then returning to the house to commit a robbery. Appellant categorically denied speaking to anyone on the phone while he was at the police station, directly contradicting the testimony of two detectives at trial.

Contrary to the expert testimony at trial, appellant asserted there was no evidence of any blood on the gloves that was consistent with the victim's blood. And although he admitted there might have been gunshot residue on the gloves, he also claimed that the gloves belonged to both him and Davila.

As for the firearm evidence, appellant denied that he had thrown any gun from the Cadillac on February 9, 1991, in the Beverly Hills incident. He also disputed the testimony of the prosecution's expert that the .32-caliber Colt that was thrown from the car was the same gun used to shoot Lee,

asserting—contrary to the evidence at trial—that no casings were ever recovered from that shooting.

Appellant also flatly denied robbing Delliquadri at gunpoint, insisting that Davila was the perpetrator of that crime.

The superior court's examination of appellant frequently took on an adversarial tone.  The court repeatedly demanded "yes" or "no" responses, disdainfully expressed disbelief at appellant's answers to the court's questions, and posed adversarial "were they lying?" questions to challenge appellant to dispute the evidence at trial or admit he was lying.  Finally, although it acknowledged the jury's finding that he did not personally use a firearm, the court nevertheless pressed appellant to admit that it was he who had murdered Maria.

**B.  *The section 1172.6 evidentiary hearing procedure***

Effective January 1, 2019, Senate Bill No. 1437 was enacted by the Legislature " 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)  In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill [No.] 1437 added section [1172.6], which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 959.)  Specifically with regard to felony-murder liability, Senate Bill No. 1437 amended section 189, subdivision (e) to add the requirement that a defendant who was not the actual killer or a direct aider and abettor with the intent to kill must have been a

major participant in the underlying felony who acted with reckless indifference to human life. (*People v. Strong* (2022) 13 Cal.5th 698, 707–708.)

Once a defendant convicted of murder under the old law has filed a facially sufficient resentencing petition under section 1172.6, the superior court must determine whether the petitioner has made a prima facie showing of eligibility for relief, and, if so, issue an order to show cause. (§ 1172.6, subd. (c); *People v. Wilson* (2023) 14 Cal.5th 839, 869 (*Wilson*); *People v. Nieber* (2022) 82 Cal.App.5th 458, 469–470.)

The superior court then conducts an evidentiary hearing to determine whether the petitioner is entitled to relief. (§ 1172.6, subd. (d)(1).) At that hearing, the superior court sits as the trier of fact, and the burden of proof rests with the prosecution " 'to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under the law as amended by Senate Bill [No.] 1437 (§ 1172.6, subd. (d)(3))." (*Wilson, supra*, 14 Cal.5th at p. 869.) "[T]he court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (§ 1172.6, subd. (d)(3).) "In addition to evidence admitted in the petitioner's prior trial, both '[t]he prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens.' ([§ 1172.6, subd. (d)(3)].) 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.' (*Ibid.*)" (*Wilson*, at p. 869; *People v. Hill* (2024) 100 Cal.App.5th 1055, 1065–1066 (*Hill*).)

11

**C.** *The superior court's aggressive examination of appellant did not constitute misconduct in the context of the section 1172.6 evidentiary hearing*

Appellant contends that the superior court committed misconduct and thereby violated his due process rights to a fair hearing before a fair tribunal by aggressively examining appellant in a manner that crossed the line from neutral arbiter to an advocate for the prosecution.[4] While we do not endorse the form the court's examination took, in the context of an evidentiary hearing on a petition for relief under section 1172.6, we find that the court's examination of appellant did not rise to the level of judicial misconduct, nor did it deprive appellant of a fair determination of his eligibility for relief.

---

[4] Respondent contends the claim is forfeited because appellant did not object to the court's examination or otherwise raise an issue of judicial misconduct below. "As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial. [Citations.] However, a defendant's failure to object does not preclude review . . . when objecting would be futile." (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237.) Here, where the court's aggressive examination of appellant filled 31 pages of the reporter's transcript compared to the eight pages of direct and cross-examination by the parties, it appears that any objection by defense counsel during the court's examination would have been futile. (See *People v. Sta Ana* (2021) 73 Cal.App.5th 44, 55 (*Sta Ana*) ["it would be unreasonable under the circumstances here to require counsel to challenge the court's own questions as explicitly or implicitly biased"]; see also *People v. Smith* (2003) 31 Cal.4th 1207, 1215 ["an appellate court is generally not prohibited from reaching questions that have not been preserved for review by a party"].)

A trial court has broad authority to "call witnesses and interrogate them the same as if they had been produced by a party to the action, and the parties may object to the questions asked and the evidence adduced the same as if such witnesses were called and examined by an adverse party." (Evid. Code, § 775; *People v. Carlucci* (1979) 23 Cal.3d 249, 255 (*Carlucci*); *Sta Ana, supra,* 73 Cal.App.5th at p. 55 ["Inherent in a court's authority under Evidence Code section 775 to call witnesses in an action is the authority to question witnesses called by the parties"].) Moreover, a trial judge's authority to question witnesses extends to cases in which either the court or a jury sits as the finder of fact. (*Carlucci*, at p. 255.)

While a trial court has both the discretion and the duty to ask questions of witnesses, its authority to examine witnesses is not without limits. (*People v. Cook* (2006) 39 Cal.4th 566, 597.) "The court's questioning must be ' "temperate, nonargumentative, and scrupulously fair," ' " and the court may not "assume the role of either the prosecution or of the defense." (*Ibid.*; see also *People v. Harris* (2005) 37 Cal.4th 310, 350 (*Harris*) [" 'The constraints on the trial judge's questioning of witnesses in the presence of a jury are akin to the limitations on the court's role as commentator. . . . "The trial court may not . . . usurp the jury's ultimate factfinding power" ' "]; *People v. Williams* (2021) 60 Cal.App.5th 191, 203 ["a trial court must avoid asking questions of a witness in a manner that 'align[s] . . . with the prosecutor in the minds of the jury' "].)

However, an evidentiary hearing under Penal Code section 1172.6. is not a trial. Rather, this was a proceeding to determine appellant's eligibility for resentencing under an ameliorative state sentencing law. (*People v. Vance* (2023) 94 Cal.App.5th 706,

13

716 (*Vance*); *People v. Mitchell* (2022) 81 Cal.App.5th 575, 589 (*Mitchell*).)  The superior court acted as an independent fact finder.  (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745 (*Garrison*).)  There was no jury, nor was appellant entitled to one. (*People v. Duran* (2022) 84 Cal.App.5th 920, 931 (*Duran*); *People v. James* (2021) 63 Cal.App.5th 604, 611.)

Thus, although section 1172.6, subdivision (d)(3) permits the parties to present additional evidence including witness testimony, the usual limitations on the superior court's examination of witnesses before a jury or in a criminal prosecution in which the defendant is presumed innocent until proven guilty simply do not apply to the evidentiary hearing. (See, e.g., *Vance*, *supra*, 94 Cal.App.5th at p. 716 ["most of the federal constitutional protections that attend a criminal conviction do not apply"]; *People v. Njoku* (2023) 95 Cal.App.5th 27, 44–45 [appellant did "not possess many of the constitutional rights afforded to a criminal defendant at trial"]; *Duran, supra,* 84 Cal.App.5th at p. 931 ["the panoply of rights that attach at trial do *not* apply during a section 1172.6 evidentiary hearing"]; *Mitchell, supra,* 81 Cal.App.5th at p. 588 ["Many constitutional protections that characterize burdensome criminal prosecutions thus do not apply in this ameliorative process"]; *People v. Myles* (2021) 69 Cal.App.5th 688, 706 ["Because a sentence modification under section [1172.6] is an act of lenity and not a criminal trial, the wrongful admission of evidence does not implicate defendant's constitutional rights under the Fifth Amendment"].)

The determination of appellant's eligibility for relief under section 1172.6 required the superior court to decide whether appellant was a major participant in the burglary who acted with reckless indifference to human life.  Appellant was the only

14

witness to testify at the evidentiary hearing, and he disavowed any knowledge of a shooting or that anyone had been hurt during the burglary. No witness at trial identified the shooter or testified about the circumstances that led to the murder. Thus, appellant's credibility was critical to the court's task of determining his eligibility for relief. And as the independent trier of fact in this proceeding, the court was not required to uncritically accept appellant's testimony. (See *Liteky v. United States* (1994) 510 U.S. 540, 551 [" 'Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions' "].)

Indeed, the court was obligated to test appellant's claims and assess his credibility in order to carry out its responsibilities under section 1172.6. (*People v. Williams* (2007) 156 Cal.App.4th 949, 956 [as the trier of fact, it is the court's duty to determine the credibility of witnesses]; see *Carlucci, supra,* 23 Cal.3d at p. 255 ["it is not merely the right but the duty of a trial judge to see that the evidence is fully developed before the trier of fact and to assure that ambiguities and conflicts in the evidence are resolved insofar as possible"].) Nor was it improper for the court as the fact finder to comment on appellant's lack of credibility. (See *Keating v. Superior Court of San Francisco* (1955) 45 Cal.2d 440, 444 ["It is the duty of a judge when acting as the trier of the facts to pass upon the credibility of witnesses, and if he believes that a party has testified falsely, and chooses to say so rather than remain silent, he is not disqualified from proceeding to render judgment"].)

In short, the superior court's aggressive examination of appellant did not rise to the level of judicial misconduct in the

context of the evidentiary hearing to determine appellant's eligibility for relief under section 1172.6.

### D. *Any error was harmless*

Even if the superior court's examination of appellant appeared to cross the line from neutral arbiter to advocate for the prosecution, appellant fails to show actual bias or prejudice. Reversal is therefore not warranted.

" '[T]he Due Process Clause clearly requires a "fair trial in a fair tribunal," [citation], before a judge with no actual bias against the defendant or interest in the outcome of his particular case.' " (*Harris, supra,* 37 Cal.4th at p. 346; *Sta Ana, supra,* 73 Cal.App.5th at p. 55.) Appellant asserts that where, as here, there is no jury to stand as a buffer between the appearance of judicial misconduct and a guilty verdict, no showing of prejudice is necessary, and reversal is required.[5] We disagree.

Appellant's argument that prejudicial error analysis is irrelevant here incorrectly assumes that even the appearance of judicial misconduct in any proceeding constitutes structural error. To be sure, structural defects requiring automatic reversal of a criminal conviction may include "trial before a judge who is not impartial." (*In re James F.* (2008) 42 Cal.4th 901, 914.) But as our Supreme Court has explained, "while a showing of actual

---

[5] Appellant cites *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237, 247, and *Hernandez v. Paicius* (2003) 109 Cal.App.4th 452, 461, for the proposition that the appearance of bias alone may violate due process mandating reversal. However, our Supreme Court has expressly disapproved the language in these cases that suggests the mere appearance of bias may establish a due process violation. (*People v. Freeman* (2010) 47 Cal.4th 993, 1006, fn. 4 (*Freeman*).)

16

bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist ' "the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable." ' " (*Freeman, supra,* 47 Cal.4th at p. 996, quoting *Caperton v. A. T. Massey Coal Co.* (2009) 556 U.S. 868, 877.)

The doctrine of structural error also does not apply in this case because, as discussed above, a section 1172.6 evidentiary hearing does not constitute a criminal trial. (*Vance, supra,* 94 Cal.App.5th at p. 716; *Garrison, supra,* 73 Cal.App.5th at p. 746.) Appellant has already been convicted of murder, and the proceeding from which he appeals was a hearing to determine his eligibility for ameliorative relief under state law. For that reason, the harmless error analysis under *People v. Watson* (1956) 46 Cal.2d 818, 836, applies. (*People v. Williams*, *supra*, 60 Cal.App.5th at p. 206 [*Watson* standard applies to determine whether judicial misconduct was prejudicial], citing *Harris, supra,* 37 Cal.4th at p. 351; *People v. Oliver* (2023) 90 Cal.App.5th 466, 489, fn. 8 [*Watson* harmless error analysis applied to trial court error in resolving § 1172.6 petition].)

Under that standard, it is not reasonably probable the outcome of the evidentiary hearing would have been different in the absence of the court's examination of appellant.

The superior court's findings at the evidentiary hearing reflect that the court based its ruling on a thorough assessment of the facts and evidence contained in the trial record rather than any bias against appellant. The court detailed at length the evidence it found in support of its conclusion that appellant was a

17

major participant in the burglary who acted with reckless indifference to human life. That evidence included appellant's admissions of his involvement in the burglary, the sophisticated nature of the crime and the planning required to pull it off, appellant's knowledge that Davila had a loaded gun when they entered the Rhew residence, appellant's awareness of the dangers posed by the nature of the crime based on his commission of attempted murder and other violent offenses involving weapons, appellant's failure to prevent the shooting or render aid to Maria before fleeing the scene, his possession of gloves that were stained with gunshot residue and blood consistent with the victim's blood type, appellant's flight from the police, and his attempt to hide the murder weapon.

The court also found that even before appellant took the stand, his constantly changing stories, denials and admissions to the police had irreparably damaged his credibility. Even in his brief testimony on direct and cross-examination at the evidentiary hearing, appellant contradicted the evidence at trial: He denied robbing, threatening or shooting Lee, he denied making a phone call during his interview with police, and he denied that the glove he dropped had blood and gunshot residue on it. The court's examination aside, based upon appellant's self-serving testimony in direct conflict with the evidence, the court reasonably could and did find appellant completely lacking in credibility.

18

## II. Substantial Evidence Supports the Superior Court's Finding that Appellant Acted With Reckless Indifference to Human Life as a Major Participant in the Burglary

Appellant does not dispute that he was a major participant in the burglary, but asserts there is no substantial evidence that he acted with reckless indifference to human life within the meaning of the Supreme Court's decisions in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), and *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*). We disagree.

"On appeal from the denial of a section 1172.6 petition after an evidentiary hearing, we review the superior court's factual findings for substantial evidence and the court's application of the law to those facts de novo. (*People v. Wilson* (2023) 90 Cal.App.5th 903, 916.) In conducting our review, we consider the whole record in the light most favorable to the superior court's findings (*People v. Rivera* (2019) 7 Cal.5th 306, 323), and we presume ' " 'every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.' " ' (*Id.* at p. 331.)" (*Hill, supra,* 100 Cal.App.5th at p. 1066.) Our task is to determine " 'whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt.' (*People v. Vargas* (2020) 9 Cal.5th 793, 820.)" (*Hill,* at p. 1066.)

" 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) Reviewing the whole record, we must " ' "determine whether *any* rational trier of fact

19

could have found the essential elements of the crime . . . beyond a reasonable doubt.' " " (*Hill, supra,* 100 Cal.App.5th at p. 1066.) "Whether the prosecutor relied upon direct or circumstantial evidence, if the trier of fact's determination is supported, reversal is not warranted, even where ' " 'the circumstances might also reasonably be reconciled with a contrary finding.' " ' " (*Ibid*.)

In *Banks*, our Supreme Court identified several factors to be considered when a court must determine whether a defendant was a major participant " 'in criminal activities known to carry a grave risk of death.' " (*Banks, supra,* 61 Cal.4th at p. 803.) A year after *Banks*, the high court handed down another list of factors to consider in determining whether a defendant acted with reckless disregard for human life. (*Clark, supra,* 63 Cal.4th at pp. 618–623.) Our Supreme Court has described the mental state of reckless indifference to human life as " 'knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Scoggins, supra,* 9 Cal.5th at p. 676, quoting *Tison v. Ariz.* (1987) 481 U.S. 137, 157.) This mental state " 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' " (*Scoggins*, at pp. 676–677, quoting *Clark, supra*, 63 Cal.4th at p. 617.)

The Court explained that "[r]eckless indifference to human life has a subjective and an objective element. (*Clark, supra*, 63 Cal.4th at p. 617.) As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' (*Banks, supra*, 61 Cal.4th at p. 801; see *Clark*, at p. 617.) As to the objective element, ' "[t]he risk [of death] must

be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' (*Clark*, at p. 617, quoting Model Pen. Code, § 2.02, subd. (2)(c).)" (*Scoggins, supra,* 9 Cal.5th at p. 677.)

The relevant factors to consider in determining reckless indifference to human life (which overlap significantly with the major participant factors identified in *Banks*) include: "(1) The defendant's use of, or awareness of the presence of a weapon or weapons; (2) The defendant's physical presence at the crime, and the opportunities to limit it and/or to aid the victim(s); (3) The duration of the felony and restraint of the victim(s); (4) The defendant's awareness that an associate is likely to kill; and (5) The defendant's efforts to minimize the risk of violence during the course of the felony." (*Hill, supra,* 100 Cal.App.5th at pp. 1074–1075; *Clark, supra,* 63 Cal.4th at pp. 618–623.) In both *Banks* and *Clark*, our Supreme Court emphasized that " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, at p. 618, quoting *Banks, supra*, 61 Cal.4th at p. 803; *Scoggins, supra,* 9 Cal.5th at p. 677.)

Analyzing the totality of the circumstances (*Scoggins, supra,* 9 Cal.5th at p. 677), and applying the *Clark* factors to the case at bar, we conclude that substantial evidence supports the superior court's finding that appellant acted with reckless indifference to human life as a major participant in the burglary. *Appellant's use of or awareness of the presence of a weapon.*

Appellant admitted knowing that Davila was armed with a loaded gun when they entered the victims' home, because "[Davila] had always kept a firearm." Although there was no

21

evidence appellant himself was carrying a gun that night, the evidence at trial revealed that not only did he frequently carry a gun, but he also used one in committing other violent crimes, including attempted murder.

*Appellant's physical presence at the crime, and opportunities to limit its scope, minimize the risk of violence, and/or aid the victim.*

The superior court determined that appellant was a major participant in the burglary, and appellant does not challenge this conclusion. In support of the finding, the court reasonably inferred from appellant's changing accounts that his description of the involvement of the fictional "Lamont" was actually a reference to his own role in the crime. And as the court explained, the direct and circumstantial evidence supporting the major participant finding also establishes the major indifference finding: Appellant was physically present during the burglary and actively involved in the removal and hiding of the stolen property. He knew there was at least one loaded gun used in the crime. And by his own account, the two perpetrators—one completely fictitious—returned to the house with the intent to rob the victims, and one of them executed Maria. After Maria was shot, appellant did nothing to help her, but instead ran away and told his family to get rid of the murder weapon, or, as he claimed, he hid the murder weapon himself.

*The duration of the crime.*

This was no quick smash and grab burglary, but a carefully planned operation carried out in silence so as not to wake the occupants of the home. But the crime did not end there. According to appellant, after the stolen property was hidden

away, the perpetrators returned to the house to line up the residents and rob them.  They then murdered Maria.

The subjective component of reckless indifference to human life is a mental state which is rarely subject to proof by direct evidence.  In assessing the sufficiency of the evidence supporting the superior court's conclusion that appellant acted with reckless indifference to human life, we accept, as we must, the logical inferences the court as trier of fact drew from the circumstantial evidence presented at appellant's trial.  (*People v. Combs* (2004) 34 Cal.4th 821, 849 ["An appellate court must accept logical inferences that the [trier of fact] might have drawn from the evidence even if the [reviewing] court would have concluded otherwise"].)  We therefore conclude that substantial evidence supports the superior court's finding that appellant acted with reckless indifference to human life as a major participant in the burglary that resulted in the death of a victim.

## DISPOSITION

The order denying appellant's petition for resentencing under Penal Code section 1172.6 is affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

CHAVEZ, J.

HOFFSTADT, J.